# HERNANDEZ *v.* COMMISSIONER OF INTERNAL REVENUE

No. 87–963.   Argued November 28, 1988—Decided June 5, 1989*

---

*Together with No. 87–1616, *Graham et al.* v. *Commissioner of Internal Revenue*, on certiorari to the United States Court of Appeals for the Ninth Circuit.

MARSHALL, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, BLACKMUN, and STEVENS, JJ., joined. O'CONNOR, J., filed a dissenting opinion, in which SCALIA, J., joined, *post*, p. 704. BRENNAN and KENNEDY, JJ., took no part in the consideration or decision of the cases.

*Michael J. Graetz* argued the cause and filed briefs for petitioners in both cases.

*Deputy Solicitor General Merrill* argued the cause for respondent in both cases. With him on the brief were *Solicitor General Fried, Assistant Attorney General Rose, Deputy Solicitor General Wallace, Alan I. Horowitz*, and *Robert S. Pomerance*.†

JUSTICE MARSHALL delivered the opinion of the Court.

Section 170 of the Internal Revenue Code of 1954 (Code), 26 U. S. C. § 170, permits a taxpayer to deduct from gross income the amount of a "charitable contribution." The Code defines that term as a "contribution or gift" to certain eligible donees, including entities organized and operated exclusively for religious purposes.[1] We granted certiorari to determine

---

†Briefs of *amici curiae* urging reversal were filed for the American Jewish Congress et al. by *Walter J. Rockler, Julius Greisman, Paul S. Berger*, and *Marc D. Stern*; and for the Council on Religious Freedom by *Lee Boothby*.

[1] Section 170 provides in pertinent part:

"(a) Allowance of deduction

"(1) General Rule

"There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.

"(c) Charitable contribution defined

"For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of—

whether taxpayers may deduct as charitable contributions payments made to branch churches of the Church of Scientology (Church) in order to receive services known as "auditing" and "training." We hold that such payments are not deductible.

I

Scientology was founded in the 1950's by L. Ron Hubbard. It is propagated today by a "mother church" in California and by numerous branch churches around the world. The mother Church instructs laity, trains and ordains ministers, and creates new congregations. Branch churches, known as "franchises" or "missions," provide Scientology services at the local level, under the supervision of the mother Church. *Church of Scientology of California* v. *Commissioner*, 823 F. 2d 1310, 1313 (CA9 1987), cert. denied, 486 U. S. 1015 (1988).

Scientologists believe that an immortal spiritual being exists in every person. A person becomes aware of this spiritual dimension through a process known as "auditing."[2] Auditing involves a one-to-one encounter between a participant (known as a "preclear") and a Church official (known as

---

"(2) A corporation, trust, or community chest, fund, or foundation—

"(A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States;

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or to foster national or international amateur sports competition (but only if no part of its activities involve the provision of athletic facilities or equipment), or for the prevention of cruelty to children or animals;

"(C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and

"(D) which is not disqualified for tax exemption under section 501(c)(3) by reason of attempting to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. . . ."

[2] Auditing is also known as "processing," "counseling," and "pastoral counseling." 83 T. C. 575, 577 (1984), aff'd, 822 F. 2d 844 (CA9 1987).

an "auditor"). An electronic device, the E-meter, helps the auditor identify the preclear's areas of spiritual difficulty by measuring skin responses during a question and answer session. Although auditing sessions are conducted one on one, the content of each session is not individually tailored. The preclear gains spiritual awareness by progressing through sequential levels of auditing, provided in short blocks of time known as "intensives." 83 T. C. 575, 577 (1984), aff'd, 822 F. 2d 844 (CA9 1987).

The Church also offers members doctrinal courses known as "training." Participants in these sessions study the tenets of Scientology and seek to attain the qualifications necessary to serve as auditors. Training courses, like auditing sessions, are provided in sequential levels. Scientologists are taught that spiritual gains result from participation in such courses. 83 T. C., at 577.

The Church charges a "fixed donation," also known as a "price" or a "fixed contribution," for participants to gain access to auditing and training sessions. These charges are set forth in schedules, and prices vary with a session's length and level of sophistication. In 1972, for example, the general rates for auditing ranged from $625 for a 12½-hour auditing intensive, the shortest available, to $4,250 for a 100-hour intensive, the longest available. Specialized types of auditing required higher fixed donations: a 12½-hour "Integrity Processing" auditing intensive cost $750; a 12½-hour "Expanded Dianetics" auditing intensive cost $950. This system of mandatory fixed charges is based on a central tenet of Scientology known as the "doctrine of exchange," according to which any time a person receives something he must pay something back. Id., at 577–578. In so doing, a Scientologist maintains "inflow" and "outflow" and avoids spiritual decline. 819 F. 2d 1212, 1222 (CA1 1987).

The proceeds generated from auditing and training sessions are the Church's primary source of income. The Church promotes these sessions not only through newspaper,

magazine, and radio advertisements, but also through free lectures, free personality tests, and leaflets. The Church also encourages, and indeed rewards with a 5% discount, advance payment for these sessions. 822 F. 2d, at 847. The Church often refunds unused portions of prepaid auditing or training fees, less an administrative charge.

Petitioners in these consolidated cases each made payments to a branch church for auditing or training sessions. They sought to deduct these payments on their federal income tax returns as charitable contributions under § 170. Respondent Commissioner, the head of the Internal Revenue Service (IRS), disallowed these deductions, finding that the payments were not charitable contributions within the meaning of § 170.[3]

Petitioners sought review of these determinations in the Tax Court. That court consolidated for trial the cases of the three petitioners in No. 87–1616: Katherine Jean Graham, Richard M. Hermann, and David Forbes Maynard. The petitioner in No. 87–963, Robert L. Hernandez, agreed to be bound by the findings in the consolidated *Graham* trial, reserving his right to a separate appeal. Before trial, the Commissioner stipulated that the branch churches of Scientology are religious organizations entitled to receive tax-deductible charitable contributions under the relevant sections of the Code. This stipulation isolated as the sole statutory issue whether payments for auditing or training sessions constitute "contribution[s] or gift[s]" under § 170.[4]

---

[3] The petitioner in No. 87–963, Robert L. Hernandez, was denied a deduction of $7,338 and was assessed a tax deficiency of $2,245 for 1981. 819 F. 2d 1212, 1215 (CA1 1987). Of the petitioners in No. 87–1616, Katherine Jean Graham was denied a deduction of $1,682 and was assessed a tax deficiency of $316.24 for 1972; Richard M. Hermann was denied a tax deduction of $3,922 and was assessed a tax deficiency of $803 for 1975; and David Forbes Maynard was denied a deduction of $5,000 (including a carryover of $2,385 for contributions made in 1976) and was assessed a tax deficiency of $643 for 1977. 83 T. C., at 575–579.

[4] The stipulation allowed the Tax Court to avoid having to decide whether the particular branches to which payments were made in these

The Tax Court held a 3-day bench trial during which the taxpayers and others testified and submitted documentary exhibits describing the terms under which the Church promotes and provides auditing and training sessions. Based on this record, the court upheld the Commissioner's decision. 83 T. C. 575 (1984). It observed first that the term "charitable contribution" in § 170 is synonymous with the word "gift," which case law had defined "as a *voluntary transfer* of property by the owner to another *without consideration* therefor." *Id.*, at 580, quoting *DeJong* v. *Commissioner*, 36 T. C. 896, 899 (1961) (emphasis in original), aff'd, 309 F. 2d 373 (CA9 1962). It then determined that petitioners had received consideration for their payments, namely, "the benefit of various religious services provided by the Church of Scientology." 83 T. C., at 580. The Tax Court also rejected the taxpayers' constitutional challenges based on the Establishment and Free Exercise Clauses of the First Amendment.

The Courts of Appeals for the First Circuit in petitioner Hernandez's case, and for the Ninth Circuit in Graham, Hermann, and Maynard's case, affirmed. The First Circuit rejected Hernandez's argument that under § 170, the IRS' ordinary inquiry into whether the taxpayer received consideration for his payment should not apply to "the return of a commensurate *religious* benefit, as opposed to an *economic or financial* benefit." 819 F. 2d, at 1217 (emphasis in original).

---

cases qualified under § 170(c)(2) and § 501(c)(3) of the Code as tax-exempt organizations entitled to receive charitable contributions. In a separate case decided during the pendency of this litigation, the Tax Court held that the mother Church in California did not qualify as a tax-exempt organization under § 501(c)(3) for the years 1970 through 1972 because it had diverted profits to its founder and others, had conspired to impede collection of its taxes, and had conducted almost all activities for a commercial purpose. *Church of Scientology of California* v. *Commissioner*, 83 T. C. 381 (1984). The Court of Appeals for the Ninth Circuit affirmed, basing its decision solely on the ground that the Church had diverted profits for the use of private individuals. It did not address the other bases of the Tax Court's decision. *Church of Scientology of California* v. *Commissioner*, 823 F. 2d 1310 (1987), cert. denied, 486 U. S. 1015 (1988).

The court found "no indication that Congress intended to distinguish the religious benefits sought by Hernandez from the medical, educational, scientific, literary, or other benefits that could likewise provide the *quid* for the *quo* of a nondeductible payment to a charitable organization." *Ibid.* The court also rejected Hernandez's argument that it was impracticable to put a value on the services he had purchased, noting that the Church itself had "established and advertised monetary prices" for auditing and training sessions, and that Hernandez had not claimed that these prices misstated the cost of providing these sessions. *Id.,* at 1218.

Hernandez's constitutional claims also failed. Because § 170 created no denominational preference on its face, Hernandez had shown no Establishment Clause violation. *Id.,* at 1218–1221. As for the Free Exercise Clause challenge, the court determined that denying the deduction did not prevent Hernandez from paying for auditing and training sessions and thereby observing Scientology's doctrine of exchange. Moreover, granting a tax exemption would compromise the integrity and fairness of the tax system. *Id.,* at 1221–1225.

The Ninth Circuit also found that the taxpayers had received a "measurable, specific return . . . as a quid pro quo for the donation" they had made to the branch churches. 822 F. 2d, at 848. The court reached this result by focusing on "the external features" of the auditing and training transactions, an analytic technique which "serves as an expedient for any more intrusive inquiry into the motives of the payor." *Ibid.* Whether a particular exchange generated secular or religious benefits to the taxpayer was irrelevant, for under § 170 "[i]t is the structure of the transaction, and not the type of benefit received, that controls." *Id.,* at 849.

The Ninth Circuit also rejected the taxpayers' constitutional arguments. The tax deduction provision did not violate the Establishment Clause because § 170 is "neutral in its design" and reflects no intent "to visit a disability on a par-

ticular religion." *Id.*, at 853. Furthermore, that the tax-payers would "have less money to pay to the Church, or that the Church [would] receive less money, [did] not rise to the level of a burden on appellants' ability to exercise their religious beliefs." *Id.*, at 851. Indeed, because the taxpayers could still make charitable donations to the branch church, they were "not put to the choice of abandoning the doctrine of exchange or losing the government benefit, for they may have both." *Ibid.* Finally, the court noted that the compelling governmental interest in "the maintenance of a sound and uniform tax system" counseled against granting a free exercise exemption. *Id.*, at 852–853.

We granted certiorari, 485 U. S. 1005 (1988); 486 U. S. 1022 (1988), to resolve a Circuit conflict concerning the validity of charitable deductions for auditing and training payments.[5] We now affirm.

## II

For over 70 years, federal taxpayers have been allowed to deduct the amount of contributions or gifts to charitable, religious, and other eleemosynary institutions. See 2 B. Bittker, Federal Taxation of Income, Estates and Gifts ¶ 35.1.1 (1981) (tracing history of charitable deduction). Section 170, the present provision, was enacted in 1954; it requires a taxpayer claiming the deduction to satisfy a number of conditions.[6] The Commissioner's stipulation in this case, how-

---

[5] Compare *Christiansen* v. *Commissioner*, 843 F. 2d 418 (CA10 1988) (holding payments not deductible), cert. pending, No. 87–2023; *Miller* v. *IRS*, 829 F. 2d 500 (CA4 1987) (same), cert. pending, No. 87–1449, with *Neher* v. *Commissioner*, 852 F. 2d 848 (CA6 1988) (holding payments deductible); *Foley* v. *Commissioner*, 844 F. 2d 94 (CA2 1988) (same), cert. pending, No. 88–102; *Staples* v. *Commissioner*, 821 F. 2d 1324 (CA8 1987) (same), cert. pending, No. 87–1382. The rulings for the taxpayer in the *Neher*, *Foley*, and *Staples* cases rested on statutory, not constitutional, grounds.

[6] The charitable transfer must be made to a qualified recipient, § 170(c), within the taxable year, § 170(a)(1), and consist of cash or qualified property, 26 U. S. C. §§ 170(e)–(h) (1982 ed. and Supp. V), not exceeding

ever, has narrowed the statutory inquiry to one such condition: whether petitioners' payments for auditing and training sessions are "contribution[s] or gift[s]" within the meaning of § 170.

The legislative history of the "contribution or gift" limitation, though sparse, reveals that Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible. The House and Senate Reports on the 1954 tax bill, for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift." S. Rep. No. 1622, 83d Cong., 2d Sess., 196 (1954); H. R. Rep. No. 1337, 83d Cong., 2d Sess., A44 (1954). Using payments to hospitals as an example, both Reports state that the gift characterization should not apply to "a payment by an individual to a hospital *in consideration of* a binding obligation to provide medical treatment for the individual's employees. It would apply only if there were no expectation of any quid pro quo from the hospital." S. Rep. No. 1622, *supra*, at 196 (emphasis added); H. Rep. No. 1337, *supra*, at A44 (emphasis added).[7]

In ascertaining whether a given payment was made with "the expectation of any quid pro quo," S. Rep. No. 1622, *supra*, at 196; H. Rep. No. 1337, *supra*, at A44, the IRS has customarily examined the external features of the transaction in question. This practice has the advantage of obviat-

a specified percentage of the taxpayer's income in the year of payment or (where a carryover is permitted) in subsequent years. 26 U. S. C. §§ 170(b), 170(d) (1982 ed. and Supp. V).

[7] The portions of these Reports explicating the term "gifts" actually address a closely related provision of the Code, § 162(b), which refers specifically to § 170. Section 162(b) provides, in pertinent part, that a taxpayer may not deduct as a trade or business expense a "contribution or gift" which would have been deductible under § 170 were it not for the fact that the taxpayer had already met the maximum amount (measured as a percentage of income) which § 170(b) permits to be deducted.

ing the need for the IRS to conduct imprecise inquiries into the motivations of individual taxpayers. The lower courts have generally embraced this structural analysis. See, *e. g.*, *Singer Co.* v. *United States*, 449 F. 2d 413, 422–423 (Ct. Cl. 1971) (applying this approach and collecting cases), cited in *United States* v. *American Bar Endowment*, 477 U. S. 105, 117 (1986); see also 2 B. Bittker, *supra*, at ¶ 35.1.3 (collecting cases). We likewise focused on external features in *United States* v. *American Bar Endowment*, *supra*, to resolve the taxpayers' claims that they were entitled to partial deductions for premiums paid to a charitable organization for insurance coverage; the taxpayers contended that they had paid unusually high premiums in an effort to make a contribution along with their purchase of insurance. We upheld the Commissioner's disallowance of the partial deductions because the taxpayers had failed to demonstrate, at a minimum, the existence of comparable insurance policies with prices lower than those of the policy they had each purchased. In so doing, we stressed that "[t]he *sine qua non* of a charitable contribution is a transfer of money or property *without adequate consideration.*" *Id.*, at 118 (emphasis added in part).[*]

In light of this understanding of § 170, it is readily apparent that petitioners' payments to the Church do not qualify as "contribution[s] or gift[s]." As the Tax Court found, these payments were part of a quintessential *quid pro quo* exchange: in return for their money, petitioners received an identifiable benefit, namely, auditing and training sessions. The Church established fixed price schedules for auditing and training sessions in each branch church; it calibrated particular prices to auditing or training sessions of particular lengths and levels of sophistication; it returned a refund if auditing and training services went unperformed; it distributed "ac-

---

[*]The sole taxpayer in *American Bar Endowment* who had demonstrated the existence of a lower premium insurance program failed to show that he was aware of this less expensive option at the time he purchased his insurance. 477 U. S., at 118.

count cards" on which persons who had paid money to the Church could monitor what prepaid services they had not yet claimed; and it categorically barred provision of auditing or training sessions for free.[9] Each of these practices reveals the inherently reciprocal nature of the exchange.

Petitioners do not argue that such a structural analysis is inappropriate under § 170, or that the external features of the auditing and training transactions do not strongly suggest a *quid pro quo* exchange. Indeed, the petitioners in the consolidated *Graham* case conceded at trial that they expected to receive specific amounts of auditing and training in return for their payments. 822 F. 2d, at 850. Petitioners argue instead that they are entitled to deductions because a *quid pro quo* analysis is inappropriate under § 170 when the benefit a taxpayer receives is purely religious in nature. Along the same lines, petitioners claim that payments made for the right to participate in a religious service should be automatically deductible under § 170.

We cannot accept this statutory argument for several reasons. First, it finds no support in the language of § 170. Whether or not Congress could, consistent with the Establishment Clause, provide for the automatic deductibility of a payment made to a church' that either generates religious benefits or guarantees access to a religious service, that is a choice Congress has thus far declined to make. Instead, Congress has specified that a payment to an organization operated exclusively for religious (or other eleemosynary) pur-

---

[9] The Tax Court referred to a Church policy directive which stated:
"Price cuts are forbidden under any guise.
"1. PROCESSING MAY NEVER BE GIVEN AWAY BY AN ORG. Processing is too expensive to deliver.

"9. ONLY FULLY CONTRACTED STAFF IS AWARDED FREE SERVICE, AND THIS IS DONE BY INVOICE AND LEGAL NOTE WHICH BECOMES DUE AND PAYABLE IF THE CONTRACT IS BROKEN." 83 T. C., at 577–578, n. 5.

poses is deductible *only* if such a payment is a "contribution or gift." 26 U. S. C. § 170(c). The Code makes no special preference for payments made in the expectation of gaining religious benefits or access to a religious service. *Foley* v. *Commissioner*, 844 F. 2d 94, 98 (CA2 1988) (Newman, J., dissenting), cert. pending, No. 88–102. The House and Senate Reports on § 170, and the other legislative history of that provision, offer no indication that Congress' failure to enact such a preference was an oversight.

Second, petitioners' deductibility proposal would expand the charitable contribution deduction far beyond what Congress has provided. Numerous forms of payments to eligible donees plausibly could be categorized as providing a religious benefit or as securing access to a religious service. For example, some taxpayers might regard their tuition payments to parochial schools as generating a religious benefit or as securing access to a religious service; such payments, however, have long been held not to be charitable contributions under § 170. *Foley, supra,* at 98, citing *Winters* v. *Commissioner,* 468 F. 2d 778 (CA2 1972); see *id.,* at 781 (noting Congress' refusal to enact legislation permitting taxpayers to deduct parochial school tuition payments). Taxpayers might make similar claims about payments for church-sponsored counseling sessions or for medical care at church-affiliated hospitals that otherwise might not be deductible. Given that, under the First Amendment, the IRS can reject otherwise valid claims of religious benefit only on the ground that a taxpayers' alleged beliefs are not sincerely held, but not on the ground that such beliefs are inherently irreligious, see *United States* v. *Ballard,* 322 U. S. 78 (1944), the resulting tax deductions would likely expand the charitable contribution provision far beyond its present size. We are loath to effect this result in the absence of supportive congressional intent. Cf. *United States* v. *Lee,* 455 U. S. 252, 259–261 (1982).

Finally, the deduction petitioners seek might raise problems of entanglement between church and state. If framed as a deduction for those payments generating benefits of a religious nature for the payor, petitioners' proposal would inexorably force the IRS and reviewing courts to differentiate "religious" benefits from "secular" ones. If framed as a deduction for those payments made in connection with a religious service, petitioners' proposal would force the IRS and the judiciary into differentiating "religious" services from "secular" ones. We need pass no judgment now on the constitutionality of such hypothetical inquiries, but we do note that "pervasive monitoring" for "the subtle or overt presence of religious matter" is a central danger against which we have held the Establishment Clause guards. *Aguilar* v. *Felton*, 473 U. S. 402, 413 (1985); see also *Widmar* v. *Vincent*, 454 U. S. 263, 272, n. 11 (1981) ("[T]he University would risk greater 'entanglement' by attempting to enforce its exclusion of 'religious worship' and 'religious speech'" than by opening its forum to religious as well as nonreligious speakers); cf. *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S. 707, 716 (1981).

Accordingly, we conclude that petitioners' payments to the Church for auditing and training sessions are not "contribution[s] or gift[s]" within the meaning of that statutory expression.[10]

### III

We turn now to petitioners' constitutional claims based on the Establishment Clause and the Free Exercise Clause of the First Amendment.

---

[10] Petitioners have not argued here that their payments qualify as "dual payments" under IRS regulations and that they are therefore entitled to a partial deduction to the extent their payments exceeded the value of the benefit received. See *American Bar Endowment*, 477 U. S., at 117 (citing Rev. Rul. 67-246, 1967-2 Cum. Bull. 104). We thus have no occasion to decide this issue.

## A

Petitioners argue that denying their requested deduction violates the Establishment Clause in two respects. First, § 170 is said to create an unconstitutional denominational preference by according disproportionately harsh tax status to those religions that raise funds by imposing fixed costs for participation in certain religious practices. Second, § 170 allegedly threatens governmental entanglement with religion because it requires the IRS to entangle itself with religion by engaging in "supervision of religious beliefs and practices" and "valuation of religious services." Brief for Petitioners 44.

Our decision in *Larson* v. *Valente*, 456 U. S. 228 (1982), supplies the analytic framework for evaluating petitioners' contentions. *Larson* teaches that, when it is claimed that a denominational preference exists, the initial inquiry is whether the law facially differentiates among religions. If no such facial preference exists, we proceed to apply the customary three-pronged Establishment Clause inquiry derived from *Lemon* v. *Kurtzman*, 403 U. S. 602 (1971).[11]

Thus analyzed, § 170 easily passes constitutional muster. The line which § 170 draws between deductible and nondeductible payments to statutorily qualified organizations does not differentiate among sects. Unlike the Minnesota statute at issue in *Larson*, which facially exempted from state registration and reporting requirements only those religious organizations that derived more than half their funds from members, § 170 makes no "explicit and deliberate distinctions between different religious organizations," 456

---

[11] "'First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion, *Board of Education* v. *Allen*, 392 U. S. 236, 243 (1968); finally, the statute must not foster "an excessive governmental entanglement with religion." *Walz* [v. *Tax Comm'n*, 397 U. S. 664, 674 (1970)].'" *Lemon* v. *Kurtzman*, 403 U. S., at 612–613, quoted in *Larson* v. *Valente*, 456 U. S., at 252.

U. S., at 246–247, n. 23, applying instead to all religious entities.

Section 170 also comports with the *Lemon* test. First, there is no allegation that § 170 was born of animus to religion in general or Scientology in particular. Cf. *Larson, supra,* at 254–255 (history of Minnesota restriction reveals hostility to "Moonies" and intent to "get at . . . people that are running around airports"). The provision is neutral both in design and purpose.

Second, the primary effect of § 170—encouraging gifts to charitable entities, including but not limited to religious organizations—is neither to advance nor inhibit religion. It is not alleged here that § 170 involves "[d]irect government action endorsing religion or a particular religious practice." *Wallace* v. *Jaffree,* 472 U. S. 38, 69 (1985) (O'CONNOR, J., concurring in judgment). It may be that a consequence of the *quid pro quo* orientation of the "contribution or gift" requirement is to impose a disparate burden on those charitable and religious groups that rely on sales of commodities or services as a means of fundraising, relative to those groups that raise funds primarily by soliciting unilateral donations. But a statute primarily having a secular effect does not violate the Establishment Clause merely because it "happens to coincide or harmonize with the tenets of some or all religions." *McGowan* v. *Maryland,* 366 U. S. 420, 442 (1961); see also *Bob Jones University* v. *United States,* 461 U. S. 574, 604, n. 30 (1983).

Third, § 170 threatens no excessive entanglement between church and state. To be sure, ascertaining whether a payment to a religious institution is part of a *quid pro quo* transaction may require the IRS to ascertain from the institution the prices of its services and commodities, the regularity with which payments for such services and commodities are waived, and other pertinent information about the transaction. But routine regulatory interaction which involves no inquiries into religious doctrine, see *Presbyterian Church in*

*U. S.* v. *Mary Elizabeth Blue Hull Memorial Presbyterian Church*, 393 U. S. 440, 451 (1969), no delegation of state power to a religious body, see *Larkin* v. *Grendel's Den, Inc.*, 459 U. S. 116 (1982), and no "detailed monitoring and close administrative contact" between secular and religious bodies, see *Aguilar*, 473 U. S., at 414, does not of itself violate the nonentanglement command. See *Tony and Susan Alamo Foundation* v. *Secretary of Labor*, 471 U. S. 290, 305–306 (1985) (stating that nonentanglement principle "does not exempt religious organizations from such secular governmental activity as fire inspections and building and zoning regulations" or the recordkeeping requirements of the Fair Labor Standards Act) (citation omitted). As we have observed, *supra*, at 694, it is petitioners' interpretation of § 170, requiring the Government to distinguish between "secular" and "religious" benefits or services, which may be "fraught with the sort of entanglement that the Constitution forbids." *Lemon*, *supra*, at 620.

Nor does the application of § 170 to religious practices require the Government to place a monetary value on particular religious benefits. As an initial matter, petitioners' claim here raises no need for valuation, for they have alleged only that their payments are fully exempt from a *quid pro quo* analysis—not that some portion of these payments is deductible because it exceeds the value of the acquired service. Cf. *American Bar Endowment*, 477 U. S., at 117 (describing "dual character" payments) (citing, *inter alia*, Rev. Rul. 68–432, 1968–2 Cum. Bull. 104, 105); see n. 10, *supra*. In any event, the need to ascertain what portion of a payment was a purchase and what portion was a contribution does not ineluctably create entanglement problems by forcing the Government to place a monetary value on a religious benefit. In cases where the economic value of a good or service is elusive—where, for example, no comparable good or service is sold in the marketplace—the IRS has eschewed benefit-focused valuation. Instead, it has often employed as an al-

ternative method of valuation an inquiry into the cost (if any) to the donee of providing the good or service. See, *e. g.*, *Oppewal* v. *Commissioner*, 468 F. 2d 1000, 1002 (CA1 1972) (cost of providing a "religiously-oriented" education); *Winters* v. *Commissioner*, 468 F. 2d 778 (CA2 1972) (same); *DeJong* v. *Commissioner*, 309 F. 2d 373 (CA9 1962) (same). This valuation method, while requiring qualified religious institutions to disclose relevant information about church costs to the IRS, involves administrative inquiries that, as a general matter, "bear no resemblance to the kind of government surveillance the Court has previously held to pose an intolerable risk of government entanglement with religion." *Tony and Susan Alamo Foundation, supra,* at 305; cf. *Lemon*, 403 U. S., at 621–622 (school-aid statute authorizing government inspection of parochial school records created impermissible "intimate and continuing relationship between church and state" because it required State "to determine which expenditures are religious and which are secular").[12]

B

Petitioners also contend that disallowance of their § 170 deductions violates their right to the free exercise of religion by "plac[ing] a heavy burden on the central practice of Scientology." Brief for Petitioners 47. The precise nature of this claimed burden is unclear, but it appears to operate in two ways. First, the deduction disallowance is said to deter adherents from engaging in auditing and training sessions. Second, the deduction disallowance is said to interfere with observance of the doctrine of exchange, which mandates equality of an adherent's "outflow" and "inflow."

---

[12] We do not rule out the possibility that, under the circumstances of a particular case, an IRS inquiry under § 170 into a religious institution's expenses might raise entanglement problems. Because petitioners' claim necessitates no valuation inquiry, however, we need only decide here that such inquiries into cost under § 170 generally pose no constitutional problem.

The free exercise inquiry asks whether government has placed a substantial burden on the observation of a central religious belief or practice and, if so, whether a compelling governmental interest justifies the burden. *Hobbie* v. *Unemployment Appeals Comm'n of Fla.*, 480 U. S. 136, 141–142 (1987); *Thomas* v. *Review Bd. of Indiana Employment Security Div.*, 450 U. S., at 717–719; *Wisconsin* v. *Yoder*, 406 U. S. 205, 220–221 (1972). It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds. *Thomas, supra*, at 716. We do, however, have doubts whether the alleged burden imposed by the deduction disallowance on the Scientologists' practices is a substantial one. Neither the payment nor the receipt of taxes is forbidden by the Scientology faith generally, and Scientology does not proscribe the payment of taxes in connection with auditing or training sessions specifically. Cf. *United States* v. *Lee*, 455 U. S., at 257. Any burden imposed on auditing or training therefore derives solely from the fact that, as a result of the deduction denial, adherents have less money available to gain access to such sessions. This burden is no different from that imposed by any public tax or fee; indeed, the burden imposed by the denial of the "contribution or gift" deduction would seem to pale by comparison to the overall federal income tax burden on an adherent. Likewise, it is unclear why the doctrine of exchange would be violated by a deduction disallowance so long as an adherent is free to equalize "outflow" with "inflow" by paying for as many auditing and training sessions as he wishes. See 822 F. 2d, at 850–853 (questioning substantiality of burden on Scientologists); 819 F. 2d, at 1222–1225 (same).

In any event, we need not decide whether the burden of disallowing the § 170 deduction is a substantial one, for our decision in *Lee* establishes that even a substantial burden would be justified by the "broad public interest in maintaining a sound tax system," free of "myriad exceptions flowing

from a wide variety of religious beliefs." 455 U. S., at 260. In *Lee*, we rejected an Amish taxpayer's claim that the Free Exercise Clause commanded his exemption from Social Security tax obligations, noting that "[t]he tax system could not function if denominations were allowed to challenge the tax system" on the ground that it operated "in a manner that violates their religious belief." *Ibid.* That these cases involve federal income taxes, not the Social Security system, is of no consequence. *Ibid.* The fact that Congress has already crafted some deductions and exemptions in the Code also is of no consequence, for the guiding principle is that a tax "must be uniformly applicable to all, except as *Congress* provides explicitly otherwise." *Id.*, at 261 (emphasis added). Indeed, in one respect, the Government's interest in avoiding an exemption is more powerful here than in *Lee;* the claimed exemption in *Lee* stemmed from a specific doctrinal obligation not to pay taxes, whereas petitioners' claimed exemption stems from the contention that an incrementally larger tax burden interferes with their religious activities. This argument knows no limitation. We accordingly hold that petitioners' free exercise challenge is without merit.

## IV

We turn, finally, to petitioners' assertion that disallowing their claimed deduction is at odds with the IRS' longstanding practice of permitting taxpayers to deduct payments made to other religious institutions in connection with certain religious practices. Through the appellate stages of this litigation, this claim was framed essentially as one of selective prosecution. The Courts of Appeals for the First and Ninth Circuits summarily rejected this claim, finding no evidence of the intentional governmental discrimination necessary to support such a claim. 822 F. 2d, at 853 (no showing of "the type of hostility to a target of law enforcement that would support a claim of selective enforcement"); 819 F. 2d, at 1223 (no "discriminatory intent" proved).

In their arguments to this Court, petitioners have shifted emphasis. They now make two closely related claims. First, the IRS has accorded payments for auditing and training disparately harsh treatment compared to payments to other churches and synagogues for their religious services: Recognition of a comparable deduction for auditing and training payments is necessary to cure this administrative inconsistency. Second, Congress, in modifying § 170 over the years, has impliedly acquiesced in the deductibility of payments to these other faiths; because payments for auditing and training are indistinguishable from these other payments, they fall within the principle acquiesced in by Congress that payments for religious services are deductible under § 170.

Although the Commissioner demurred at oral argument as to whether the IRS, in fact, permits taxpayers to deduct payments made to purchase services from other churches and synagogues, Tr. of Oral Arg. 30–31, the Commissioner's periodic revenue rulings have stated the IRS' position rather clearly. A 1971 ruling, still in effect, states: "Pew rents, building fund assessments, and periodic dues paid to a church . . . are all methods of making contributions to the church, and such payments are deductible as charitable contributions within the limitations set out in section 170 of the Code." Rev. Rul. 70–47, 1970–1 Cum. Bull. 49 (superseding A.R.M. 2, Cum. Bull. 150 (1919)). We also assume for purposes of argument that the IRS also allows taxpayers to deduct "specified payments for attendance at High Holy Day services, for tithes, for torah readings and for memorial plaques." *Foley* v. *Commissioner*, 844 F. 2d, at 94, 96.

The development of the present litigation, however, makes it impossible for us to resolve petitioners' claim that they have received unjustifiably harsh treatment compared to adherents of other religions. The relevant inquiry in determining whether a payment is a "contribution or gift" under § 170 is, as we have noted, not whether the payment secures reli-

gious benefits or access to religious services, but whether the transaction in which the payment is involved is structured as a *quid pro quo* exchange. To make such a determination in this case, the Tax Court heard testimony and received documentary proof as to the terms and structure of the auditing and training transactions; from this evidence it made factual findings upon which it based its conclusion of nondeductibility, a conclusion we have held consonant with § 170 and with the First Amendment.

Perhaps because the theory of administrative inconsistency emerged only on appeal, petitioners did not endeavor at trial to adduce from the IRS or other sources any specific evidence about other religious faiths' transactions. The IRS' revenue rulings, which merely state the agency's conclusions as to deductibility and which have apparently never been reviewed by the Tax Court or any other judicial body, also provide no specific facts about the nature of these other faiths' transactions. In the absence of such facts, we simply have no way (other than the wholly illegitimate one of relying on our personal experiences and observations) to appraise accurately whether the IRS' revenue rulings have correctly applied a *quid pro quo* analysis with respect to any or all of the religious practices in question. We do not know, for example, whether payments for other faiths' services are truly obligatory or whether any or all of these services are generally provided whether or not the encouraged "mandatory" payment is made.

The IRS' application of the "contribution or gift" standard may be right or wrong with respect to these other faiths, or it may be right with respect to some religious practices and wrong with respect to others. It may also be that some of these payments are appropriately classified as partially deductible "dual payments." With respect to those religions where the structure of transactions involving religious services is established not centrally but by individual congregations, the proper point of reference for a *quid pro quo* analy-

sis might be the individual congregation, not the religion as a whole. Only upon a proper factual record could we make these determinations. Absent such a record, we must reject petitioners' administrative consistency argument.[13]

Petitioners' congressional acquiescence claim fails for similar reasons. Even if one assumes that Congress has acquiesced in the IRS' ruling with respect to "[p]ew rents, building fund assessments, and periodic dues," Rev. Rul. 70–47, 1970–1 Cum. Bull. 49, the fact is that the IRS' 1971 ruling articulates no broad principle of deductibility, but instead merely identifies as deductible three discrete types of payments. Having before us no information about the nature or structure of these three payments, we have no way of discerning any possible unifying principle, let alone whether such a principle would embrace payments for auditing and training sessions.

## V

For the reasons stated herein, the judgments of the Courts of Appeals are hereby

*Affirmed.*

JUSTICE BRENNAN and JUSTICE KENNEDY took no part in the consideration or decision of these cases.

---

[13] Petitioners argue that an unofficial "question and answer guidance package" recently issued by an IRS official requires deductibility of payments for auditing and training sessions. Referring to the revenue ruling on pew rents, the brochure states that "fixed payments for similar religious services" are fully deductible. See IRS Official Explains New Examination-Education Program on Charitable Contributions to Tax-Exempt Organizations, BNA Daily Report for Executives, Special Report No. 186, J–1, J–3 (Sept. 26, 1988) (cited in Reply Brief for Petitioners 6). In ascertaining the IRS' justifications for its administrative practice, however, our practice is to rely on the agency's official rulings, not on the unofficial interpretations of particular IRS officials. In any event, the brochure on which petitioners rely was not included in the record before the Tax Court or the Courts of Appeals in these cases, and, in fact, was issued months after we granted certiorari.

JUSTICE O'CONNOR, with whom JUSTICE SCALIA joins, dissenting.

The Court today acquiesces in the decision of the Internal Revenue Service (IRS) to manufacture a singular exception to its 70-year practice of allowing fixed payments indistinguishable from those made by petitioners to be deducted as charitable contributions. Because the IRS cannot constitutionally be allowed to select which religions will receive the benefit of its past rulings, I respectfully dissent.

The cases before the Court have an air of artificiality about them that is due to the IRS' dual litigation strategy against the Church of Scientology (Church). As the Court notes, *ante*, at 686–687, n. 4, the IRS has successfully argued that the mother Church of Scientology was not a tax-exempt organization from 1970 to 1972 because it had diverted profits to the founder of Scientology and others, conspired to impede collection of its taxes, and conducted almost all of its activities for a commercial purpose. See *Church of Scientology of California* v. *Commissioner*, 83 T. C. 381 (1984), aff'd, 823 F. 2d 1310 (CA9 1987), cert. denied, 486 U. S. 1015 (1988). In the cases before the Court today, however, the IRS decided to contest the payments made to Scientology under 26 U. S. C. § 170 rather than challenge the tax-exempt status of the various branches of the Church to which the payments were made. According to the Deputy Solicitor General, the IRS challenged the payments themselves in order to expedite matters. Tr. of Oral Arg. 26–29. See also *Neher* v. *Commissioner*, 852 F. 2d 848, 850–851 (CA6 1988). As part of its litigation strategy in these cases, the IRS agreed to several stipulations which, in my view, necessarily determine the proper approach to the questions presented by petitioners.

The stipulations, relegated to a single sentence by the Court, *ante*, at 686, established that Scientology was at all relevant times a religion; that each Scientology branch to which payments were made was at all relevant times a "church" within the meaning of § 170(b)(1)(A)(i); and that

Scientology was at all times a "corporation" within the meaning of § 170(c)(2) and exempt from general income taxation under 26 U. S. C. § 501(a). See App. 38, ¶¶ 52–53; 83 T. C. 575, 576 (1984), aff'd, 822 F. 2d 844 (CA9 1987). As the Solicitor General recognizes, it follows from these stipulations that Scientology operates for "'charitable purposes'" and puts the "public interest above the private interest." Brief for Respondent 30. See also *Neher, supra,* at 855. Moreover, the stipulations establish that the payments made by petitioners are fixed donations made by individuals to a tax-exempt religious organization in order to participate in religious services, and are not based on "market prices set to reap the profits of a commercial moneymaking venture." *Staples* v. *Commissioner,* 821 F. 2d 1324, 1328 (CA8 1987), cert. pending, No. 87–1382. The Tax Court, however, appears to have ignored the stipulations. It concluded, perhaps relying on its previous opinion in *Church of Scientology,* that "Scientology operates in a commercial manner in providing [auditing and training]. In fact, one of its articulated goals is to make money." 83 T. C., at 578. The Solicitor General has duplicated the error here, referring on numerous occasions to the commercial nature of Scientology in an attempt to negate the effect of the stipulations. See Brief for Respondent 13–14, 23, 25, 44.

It must be emphasized that the IRS' position here is *not* based upon the contention that a portion of the knowledge received from auditing or training is of secular, commercial, nonreligious value. Thus, the denial of a deduction in these cases bears no resemblance to the denial of a deduction for religious-school tuition up to the market value of the secularly useful education received. See *Oppewal* v. *Commissioner,* 468 F. 2d 1000 (CA1 1972); *Winters* v. *Commissioner,* 468 F. 2d 778 (CA2 1972); *DeJong* v. *Commissioner,* 309 F. 2d 373 (CA9 1962). Here the IRS denies deductibility solely on the basis that the exchange is a *quid pro quo,* even though the *quid* is exclusively of spiritual or religious worth. Re-

spondent cites no instances in which this has been done before, and there are good reasons why.

When a taxpayer claims as a charitable deduction part of a fixed amount given to a charitable organization in exchange for benefits that have a commercial value, the allowable portion of that claim is computed by subtracting from the total amount paid the value of the physical benefit received. If at a charity sale one purchases for $1,000 a painting whose market value is demonstrably no more than $50, there has been a contribution of $950. The same would be true if one purchases a $1,000 seat at a charitable dinner where the food is worth $50. An identical calculation can be made where the *quid* received is not a painting or a meal, but an intangible such as entertainment, so long as that intangible has some market value established in a noncontributory context. Hence, one who purchases a ticket to a concert, at the going rate for concerts by the particular performers, makes a charitable contribution of zero even if it is announced in advance that all proceeds from the ticket sales will go to charity. The performers may have made a charitable contribution, but the audience has paid the going rate for a show.

It becomes impossible, however, to compute the "contribution" portion of a payment to a charity where what is received in return is not merely an intangible, but an intangible (or, for that matter a tangible) that is not bought and sold except in donative contexts so that the only "market" price against which it can be evaluated is a market price that always includes donations. Suppose, for example, that the charitable organization that traditionally solicits donations on Veterans Day, in exchange for which it gives the donor an imitation poppy bearing its name, were to establish a flat rule that no one gets a poppy without a donation of at least $10. One would have to say that the "market" rate for such poppies was $10, but it would assuredly not be true that everyone who "bought" a poppy for $10 made no contribution. Similarly, if one buys a $100 seat at a prayer break-

fast—receiving as the *quid pro quo* food for both body and soul—it would make no sense to say that no charitable contribution whatever has occurred simply because the "going rate" for all prayer breakfasts (with equivalent bodily food) is $100. The latter may well be true, but that "going rate" *includes* a contribution.

Confronted with this difficulty, and with the constitutional necessity of not making irrational distinctions among taxpayers, and with the even higher standard of equality of treatment among *religions* that the First Amendment imposes, the Government has only two practicable options with regard to distinctively religious *quids pro quo:* to disregard them all, or to tax them all. Over the years it has chosen the former course.

Congress enacted the first charitable contribution exception to income taxation in 1917. War Revenue Act of 1917, ch. 63, § 1201(2), 40 Stat. 330. A mere two years later, in A.R.M. 2, 1 Cum. Bull. 150 (1919), the IRS gave its first blessing to the deductions of fixed payments to religious organizations as charitable contributions:

> "[T]he distinction of pew rents, assessments, church dues, and the like from basket collections is hardly warranted by the act. The act reads 'contributions' and 'gifts.' It is felt that all of these come within the two terms.
>
> "In substance it is believed that these are simply methods of contributing although in form they may vary. Is a basket collection given involuntarily to be distinguished from an envelope system, the latter being regarded as 'dues'? From a technical angle, the pew rents may be differentiated, but in practice the so-called 'personal accommodation' they may afford is conjectural. It is believed that the real intent is to contribute and not to hire a seat or pew for personal accommodation. In fact, basket contributors sometimes receive the same accommodation informally."

The IRS reaffirmed its position in 1970, ruling that "[p]ew rents, building fund assessments and periodic dues paid to a church . . . are all methods of making contributions to the church and such payments are deductible as charitable contributions." Rev. Rul. 70–47, 1970–1 Cum. Bull. 49. Similarly, notwithstanding the "form" of Mass stipends as fixed payments for specific religious services, see *infra*, at 709, the IRS has allowed charitable deductions of such payments. See Rev. Rul. 78–366, 1978–2 Cum. Bull. 241.

These rulings, which are "official interpretation[s] of [the tax laws] by the [IRS]," Rev. Proc. 78–24, 1978–2 Cum. Bull. 503, 504, flatly contradict the Solicitor General's claim that there "is no administrative practice recognizing that payments made in exchange for religious benefits are tax deductible." Brief for Respondent 16. Indeed, an Assistant Commissioner of the IRS recently explained in a "question and answer guidance package" to tax-exempt organizations that "[i]n contrast to tuition payments, religious observances generally are not regarded as yielding private benefits to the donor, who is viewed as receiving only incidental benefits when attending the observances. The primary beneficiaries are viewed as being the general public and members of the faith. Thus, payments for saying masses, pew rents, tithes, and other payments involving fixed donations for similar religious services, are fully deductible contributions." IRS Official Explains New Examination-Education Program on Charitable Contributions to Tax-Exempt Organizations, BNA Daily Report for Executives, Special Report No. 186, J–1, J–3 (Sept. 26, 1988). Although this guidance package may not be as authoritative as IRS rulings, see *ante*, at 703, n. 13, in the absence of any contrary indications it does reflect the continuing adherence of the IRS to its practice of allowing deductions for fixed payments for religious services.

There can be no doubt that at least some of the fixed payments which the IRS has treated as charitable deductions, or which the Court assumes the IRS would allow taxpayers to

deduct, *ante*, at 690–691, are as "inherently reciprocal," *ante*, at 692, as the payments for auditing at issue here. In exchange for their payment of pew rents, Christians receive particular seats during worship services. See Encyclopedic Dictionary of Religion 2760 (1979). Similarly, in some synagogues attendance at the worship services for Jewish High Holy Days is often predicated upon the purchase of a general admission ticket or a reserved seat ticket. See J. Feldman, H. Fruhauf, & M. Schoen, Temple Management Manual, ch. 4, p. 10 (1984). Religious honors such as publicly reading from Scripture are purchased or auctioned periodically in some synagogues of Jews from Morocco and Syria. See H. Dobrinsky, A Treasury of Sephardic Laws and Customs 164, 175–177 (1986). Mormons must tithe their income as a necessary but not sufficient condition to obtaining a "temple recommend," *i. e.*, the right to be admitted into the temple. See The Book of Mormon, 3 Nephi 24:7–12 (1921); Reorganized Church of Jesus Christ of Latter-day Saints, Book of Doctrine and Covenants § 106:1b (1978); *Corporation of Presiding Bishop of Church of Jesus Christ of Latter-day Saints v. Amos*, 483 U. S. 327, 330, n. 4 (1987). A Mass stipend—a fixed payment given to a Catholic priest, in consideration of which he is obliged to apply the fruits of the Mass for the intention of the donor—has similar overtones of exchange. According to some Catholic theologians, the nature of the pact between a priest and a donor who pays a Mass stipend is "a bilateral contract known as *do ut facias*. One person agrees to give while the other party agrees to do something in return." 13 New Catholic Encyclopedia, Mass Stipend, p. 715 (1967). A finer example of a *quid pro quo* exchange would be hard to formulate.

This is not a situation where the IRS has explicitly and affirmatively reevaluated its longstanding interpretation of § 170 and decided to analyze *all* fixed religious contributions under a *quid pro quo* standard. There is no indication whatever that the IRS has abandoned its 70-year practice with re-

spect to payments made by those other than Scientologists. In 1978, when it ruled that payments for auditing and training were not charitable contributions under § 170, the IRS did not cite—much less try to reconcile—its previous rulings concerning the deductibility of other forms of fixed payments for religious services or practices. See Rev. Rul. 78–189, 1978–1 Cum. Bull. 68 (equating payments for auditing with tuition paid to religious schools).

Nevertheless, respondent now attempts to reconcile his previous rulings with his decision in these cases by relying on a distinction between direct and incidental benefits in exchange for payments made to a charitable organization. This distinction, adumbrated as early as the IRS' 1919 ruling, recognizes that even a deductible charitable contribution may generate certain benefits for the donor. As long as the benefits remain "incidental" and do not indicate that the payment was actually made for the "personal accommodation" of the donor, the payment will be deductible. It is respondent's view that the payments made by petitioners should not be deductible under § 170 because the "unusual facts in these cases . . . demonstrate that the payments were made primarily for 'personal accommodation.'" Brief for Respondent 41. Specifically, the Solicitor General asserts that "the rigid connection between the provision of auditing and training services and payment of the fixed price" indicates a *quid pro quo* relationship and "reflect[s] the value that petitioners expected to receive for their money." *Id.*, at 16.

There is no discernible reason why there is a more rigid connection between payment and services in the religious practices of Scientology than in the religious practices of the faiths described above. Neither has respondent explained why the benefit received by a Christian who obtains the pew of his or her choice by paying a rental fee, a Jew who gains entrance to High Holy Day services by purchasing a ticket, a Mormon who makes the fixed payment necessary for a temple recommend, or a Catholic who pays a Mass stipend,

is incidental to the real benefit conferred on the "general public and members of the faith," BNA Daily Report, at J–3, while the benefit received by a Scientologist from auditing is a personal accommodation. If the perceived difference lies in the fact that Christians and Jews worship in congregations, whereas Scientologists, in a manner reminiscent of Eastern religions, see App. 78–83 (testimony of Dr. Thomas Love), gain awareness of the "immortal spiritual being" within them in one-to-one sessions with auditors, *ante*, at 684–685, such a distinction would raise serious Establishment Clause problems. See *Wallace* v. *Jaffree*, 472 U. S. 38, 69–70 (1985) (O'CONNOR, J., concurring in judgment); *Lynch* v. *Donnelly*, 465 U. S. 668, 687–689 (1984) (concurring opinion). The distinction is no more legitimate if it is based on the fact that congregational worship services "would be said anyway," Brief for Respondent 43, without the payment of a pew rental or stipend or tithe by a particular adherent. The relevant comparison between Scientology and other religions must be between the Scientologist undergoing auditing or training on one hand and the congregation on the other. For some religions the central importance of the congregation achieves legal dimensions. In Orthodox Judaism, for example, certain worship services cannot be performed and Scripture cannot be read publicly without the presence of at least 10 men. 12 Encyclopaedia Judaica, Minyan, p. 68 (1972). If payments for participation occurred in such a setting, would the benefit to the 10th man be only incidental while for the personal accommodation of the 11th? In the same vein, will the deductibility of a Mass stipend turn on whether there are other congregants to hear the Mass? And conversely, does the fact that the payment of a tithe by a Mormon is an absolute prerequisite to admission to the temple make that payment for admission a personal accommodation regardless of the size of the congregation?

Given the IRS' stance in these cases, it is an understatement to say that with respect to fixed payments for religious

services "the line between the taxable and the immune has been drawn by an unsteady hand." *United States* v. *Allegheny County*, 322 U. S. 174, 176 (1944) (Jackson, J.). This is not a situation in which a governmental regulation "happens to coincide or harmonize with the tenets of some or all religions," *McGowan* v. *Maryland*, 366 U. S. 420, 442 (1961), but does not violate the Establishment Clause because it is founded on a neutral, secular basis. See *Bob Jones University* v. *United States*, 461 U. S. 574, 604, n. 30 (1983). Rather, it involves the differential application of a standard based on constitutionally impermissible differences drawn by the Government among religions. As such, it is best characterized as a case of the Government "put[ting] an imprimatur on [all but] one religion." *Gillette* v. *United States*, 401 U. S. 437, 450 (1971). That the Government may not do.

The Court attempts to downplay the constitutional difficulty created by the IRS' different treatment of other fixed payments for religious services by accepting the Solicitor General's invitation to let the IRS make case-specific *quid pro quo* determinations. See *ante*, at 702 ("The IRS' application of the 'contribution or gift' standard may be right or wrong with respect to these other faiths, or it may be right with respect to some religious practices and wrong with respect to others"). See also Brief for Respondent 41–42. As a practical matter, I do not think that this unprincipled approach will prove helpful. The Solicitor General was confident enough in his brief to argue that, "even without making a detailed factual inquiry," Mormon tithing does not involve a *quid pro quo* arrangement. *Id.*, at 43–44. At oral argument, however, the Deputy Solicitor General conceded that if it was mandatory, tithing would be distinguishable from the "ordinary case of church dues." Tr. of Oral Arg. 36–37. If the approach suggested by the Solicitor General is so malleable and indefinite, it is not a panacea and cannot be trusted to secure First Amendment rights against arbitrary incursions by the Government.

On a more fundamental level, the Court cannot abjure its responsibility to address serious constitutional problems by converting a violation of the Establishment Clause into an "administrative consistency argument," *ante*, at 703, with an inadequate record.   It has chosen to ignore both longstanding, clearly articulated IRS practice, and the failure of respondent to offer any cogent, neutral explanation for the IRS' refusal to apply this practice to the Church of Scientology.   Instead, the Court has pretended that whatever errors in application the IRS has committed are hidden from its gaze and will, in any event, be rectified in due time.

In my view, the IRS has misapplied its longstanding practice of allowing charitable contributions under § 170 in a way that violates the Establishment Clause.   It has unconstitutionally refused to allow payments for the religious service of auditing to be deducted as charitable contributions in the same way it has allowed fixed payments to other religions to be deducted.   Just as the Minnesota statute at issue in *Larson* v. *Valente*, 456 U. S. 228 (1982), discriminated against the Unification Church, the IRS' application of the *quid pro quo* standard here—and only here—discriminates against the Church of Scientology.   I would reverse the decisions below.