In re Paul L. NEWMAN and Myrtle
Gladys Newman, Debtors.

J. Michael MORRIS, Trustee, Plaintiff,

v.

MIDWAY SOUTHERN BAPTIST
CHURCH, Defendant.

Bankruptcy No. 95–1228–WEB.

United States District Court,
D. Kansas.

Nov. 26, 1996.

Edgar W. Dwire, Malone, Dwire & Jones, Wichita, KS, for Midway Southern Baptist Church.

J. Michael Morris, Klenda, Mitchell, Austerman & Zuercher, Wichita, KS, for J. Michael Morris.

### Memorandum and Order

WESLEY E. BROWN, Senior District Judge.

The trustee brought an adversary complaint to recover $2,442.22 donated by the debtors, Paul and Myrtle Newman, to Midway Southern Baptist Church ("Midway"). The debtors donated the money in the year before their bankruptcy pursuant to a regular practice of tithing (i.e., giving the church approximately a tenth of their income), which they believe is a spiritual obligation of church members. Following an evidentiary hearing, the bankruptcy court held that the trustee could recover the donations under the "constructive fraud" provisions of 11 U.S.C. § 548(a)(2) and rejected Midway's argument that such recovery violated the debtor's First Amendment rights or their rights under the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.A. § 2000bb (West Supp.1994). Midway argues in this appeal that the bankruptcy court misconstrued § 548 and erred in its application of the First Amendment and RFRA.[1]

The district court has jurisdiction to review final orders of the bankruptcy court. 28 U.S.C. § 158(a). Because this court sits as an appellate court when reviewing bankruptcy orders, it must accept the factual findings of the bankruptcy court unless they are clearly erroneous. *Robinson v. Tenantry (In re Robinson)*, 987 F.2d 665, 667 (10th Cir.1993). The bankruptcy court's legal determinations are reviewed *de novo. Id.*

### A. Facts.

The bankruptcy court made the following findings of fact (footnotes have been omitted):

1. This bankruptcy case was filed by the debtors on February 3, 1994.

2. Within one year before the date of the filing of their petition, the debtors transferred to the church a total of $2,457.72.

3. The debtors were insolvent at the time of all of the transfers.

4. The debtors made the following payments to the church within one year of filing their petition:

| Date | Amount | Purpose |
|---|---|---|
| January 3, 1993 | $176.00 | "Tithe and Mission" |
| February 3, 1993 | 5.50 | "Dinner" |

---

1. The court finds that the facts and legal arguments are adequately presented in the briefs and record and that oral argument would not assist in determining the appeal. *See* Fed.R.Bankr.P. 8012.

| | | |
|---|---|---|
| February 7, 1993 | 171.00 | "Tithe and Mission" |
| February 28, 1993 | 10.00 | "Hymnals" |
| March 7, 1993 | 171.00 | No purpose stated |
| April 1, 1993 | 171.00 | "Tithe and Mission" |
| May 1, 1993 | 171.00 | "Tithe and Mission" |
| June 1, 1993 | 171.00 | "Tithe and Mission" |
| July 3, 1993 | 171.00 | "Tithe and Mission" |
| July 21, 1993 | 183.22 | "Tithe and Mission" |
| August 1, 1993 | 171.00 | "Tithe and Mission" |
| November 7, 1993 | 177.00 | "Tithe and Mission" |
| December 3, 1993 | 177.00 | "Tithe and Mission" |
| January 1, 1993 [sic] | 177.00 | "Tithe and Mission" |
| February 1, 1994 | 177.00 | "Tithe and Mission" |

5. The debtors have a sincere and firmly held belief in tithing. They had no *fraudulent* intent in making their payments to the church.

6. The practice of tithing, which originates in the Bible, requires that religious persons give one-tenth of their gross income to their place of worship. The debtors' actual contributions exceeded ten percent of their income.

7. The debtors transferred $2,457.72 to the defendant in the year preceding the filing of their bankruptcy petition. The debtors received less than reasonably equivalent value in exchange for the payments of $2,442.22. The debtors' transfers of $5.50 for "meals" and $10.00 for "hymnals" were in return for reasonably equivalent value. That would account for the difference between the amount transferred and the amount claimed by the trustee.

8. The church is not a mere conduit for the donations made by the debtors. The church exercises considerable discretion in which of its ministries it will fund on a month-to-month basis and funds its fixed expenses before paying over funds collected from the parishioners to other church-affiliated groups.

9. While the church's constitution and bylaws require a member to tithe, no member has ever been expelled from the church for nonpayment of the tithe. No effort is made by the minister of the church to determine whether a member is meeting his or her obligation to tithe.

10. The debtors are in their 70s, in poor health and eke out a difficult existence on an income of $1,556 per month. The debtors' schedule J, Current Expenditures of Individual Debtors, shows current monthly expenses of $2,458, including debt service payments and $177 per month to the church. The debtors own a mobile home, a car, and their clothing and household goods. The 1991 car is subject to a lien securing a debt of $9,000. The schedules indicate that the debtors have unsecured debts of $16,365, consisting primarily of credit card and medical debts.

11. The debtors have received considerable support and assistance from the church and its members in the last few years in the form of counselling, car and housing repairs, groceries, and transportation. However, the church was unable to document any actual expenditures for the groceries, repairs, or other tangible assistance furnished to the debtors.

## B. *Discussion.*

### 1. *Section 548.*

Section 548 of Title 11, entitled "Fraudulent transfers and obligations," provides in part:

(a) The trustee may avoid any transfer of an interest of the debtor in property, ... that was made or occurred within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

\* \* \* \* \* \*

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and

(B)(i) was insolvent on the date that such transfer was made....

The above portion of the statute, known as the "constructive fraud" provision,

does not require that a debtor act with an actual intent to defraud his creditors before a transfer can be avoided. *Cf.* § 548(a)(1). To the contrary, it can operate to avoid transfers like those in the instant case that are motivated by generosity rather than fraudulent intent. In doing so, it reflects the policy that a debtor who has become insolvent should be just to his creditors before he is generous to others. *See Boston Trading Group, Inc. v. Burnazos*, 835 F.2d 1504, 1508 (1st Cir.1987).

The parties stipulated in this case that the transfers at issue involved interests of the debtors in property, that they occurred within one year of the debtors' bankruptcy filing, and that the debtors were insolvent on the dates of the various transfers. Thus, the only element of § 548(a)(2) in dispute is whether the debtors "received less than reasonably equivalent value in exchange for" the transfers. The bankruptcy court concluded that the trustee had shown this element, both because the services provided to the debtors by Midway were not "in exchange for" the debtors' tithes, and because those services did not constitute "value" within the meaning of § 548. On appeal, Midway argues that § 548(a)(2), as applied, discriminates against religious organizations and "should be interpreted to avoid these discriminations." Aplt. Br. at 15–16.

■■■■ The court rejects the suggestion that § 548 can be construed other than according to its terms. In interpreting statutes, the court begins with the relevant language. *Aulston v. United States*, 915 F.2d 584, 589 (10th Cir.1990), *cert. denied*, 500 U.S. 916, 111 S.Ct. 2011, 114 L.Ed.2d 98 (1991). If the terms of the statute are unambiguous, the court's inquiry is complete, except in rare circumstances.[2] *Id.* Here, the terms of § 548(a)(2) are unambiguous and the bankruptcy court properly found that the trustee met the requirements for avoidance of the transfers. The evidence presented at trial supports the bankruptcy court's finding

that the benefits received from the church were not given "in exchange for" the debtors' contributions. Midway provided services and benefits to its members, including the debtors, regardless of whether or not they tithed. The debtors obviously contributed to the church from a sense of moral obligation, but were under no legal obligation to do so, and would have had the same services available even had they not contributed. Clearly, any value received by the debtors from the church was not "in exchange for" their contributions. *Cf. Fitzgerald v. Magic Valley Evangelical Free Church (In re Hodge)*, 200 B.R. 884, 893 (D.Idaho 1996). *See also Hernandez v. Comm. of Internal Rev.*, 490 U.S. 680, 691–92, 109 S.Ct. 2136, 2144–45, 104 L.Ed.2d 766 (1989) (distinguishing between quid pro quo payments and charitable contributions).

■■■■ The evidence also supports the bankruptcy court's finding that the debtors did not receive "reasonably equivalent value" from the church. *See Clark v. Security Pacific Bus. Credit, Inc. (In re Wes Dor, Inc.)*, 996 F.2d 237, 242 (10th Cir.1993) (trial court is given considerable latitude in determining whether transfer is for "reasonably equivalent value"). The court does not question Midway's suggestion that the debtors received "satisfaction of their spiritual commitment" from tithing and that such a benefit has great religious value. Aplt.Br. at 12. The term "value," as used in § 548, however, means "property, or satisfaction or securing of a present or antecedent debt of the debtor, . . ." § 548(d)(2)(A). "Debt" means "liability on a claim," and "claim" refers to a right to payment or to an equitable remedy for breach of performance. *See* § 101, subs. (6) & (12). Clearly, the statute asks whether the debtor was provided something with economic value, as opposed to religious or spiritual value. *See e.g., Harman v. First Am. Bank of Md. (In re Jeffrey Bigelow Design Group, Inc.)*, 956 F.2d 479, 484 (4th Cir.1992) (Because the purpose of fraudulent transfer

---

**2.** While it is true that federal statutes are to be construed so as to avoid serious doubts as to their constitutionality, *see Communications Workers of America v. Beck*, 487 U.S. 735, 762, 108 S.Ct. 2641, 2657, 101 L.Ed.2d 634 (1988), that rule may not be employed to embrace a construction that is plainly contrary to the intent of

Congress. *Id.* Appellant's suggested construction of the statute would require the court to rewrite the definition of "value" adopted by Congress in § 548. Additionally, as is discussed *infra*, the court finds no constitutional infirmity in the avoidance of these transfers under § 548.

law is to preserve the debtor's estate for the benefit of its creditors, the focus of § 548(a)(2) is on whether the net effect of the transaction has depleted the bankruptcy estate.) As the bankruptcy court noted, the evidence at trial failed to show that the debtors received any quantifiable economic benefit as a result of their donations. *Cf. In re Moses,* supra (evidence established value of counseling and other services received by debtors) and *Hernandez,* supra (petitioners received auditing and training sessions subject to fixed price schedules). Under the circumstances, the bankruptcy court did not err in finding that the transfers were avoidable under § 548(a)(2). *See Christians v. Crystal Evangelical Free Church (In re Young),* 82 F.3d 1407, 1415–16 (8th Cir.1996), *reh'g. denied,* 89 F.3d 494. *See also In re Hodge,* supra. *But cf. Ellenberg v. Chapel Hill Harvester Church (In re Moses),* 59 B.R. 815 (Bankr.N.D.Ga.1986) (debtor received value for donations); *Wilson v. Upreach Ministries (In re Missionary Baptist Foundation of America, Inc.),* 24 B.R. 973 (Bankr.N.D.Tex.1982) (same).

2. *First Amendment—Free Exercise of Religion.*

█ Midway next contends that avoidance of the debtors' tithes violates the First Amendment rights of both the debtors[3] and the church. Permitting the trustee to recover discriminates against religious activity, Midway argues, because it amounts to an attempt "to undo act of worship." Aplt.Br. at 11. It also discriminates against religious organizations because they, unlike secular organizations, have a charitable mission and therefore do not refuse service to those unable or unwilling to pay. *Id.* at 13. Moreover, Midway believes, even though § 548(a)(2) is facially neutral, it discriminates because it permits recovery of tithes on the grounds that they are detrimental to creditors but does not void similar transfers of a secular nature—when the debtor receives personal services or consumes goods, for ex-

ample—even though the latter may also harm creditors. Finally, Midway contends that recovery of tithes interferes with the church's autonomy and creates an excessive entanglement of church and state. Midway argues that such discrimination and interference can only be justified by a compelling governmental interest and that a compelling interest is not present here.

█ The Free Exercise Clause of the First Amendment provides that "Congress shall make no law respecting an establishment of religion, or *prohibiting the free exercise thereof. . . .*" U.S. Const. amend. I (emphasis added). As explained in *Employment Div., Dept. Human Res. of Oregon v. Smith,* 494 U.S. 872, 877, 110 S.Ct. 1595, 1599, 108 L.Ed.2d 876 (1990), "[t]he free exercise of religion means, first and foremost, the right to believe and profess whatever religious doctrine one desires. Thus, the First Amendment obviously excludes all 'governmental regulation of *beliefs* as such.'" Of course, the exercise of religion often involves more than beliefs; it encompasses physical acts as well. *Id.* Governmental attempts to single out such acts and ban them only when they are engaged in for religious reasons are invalid unless the ban is justified by a compelling interest and is narrowly tailored to advance that interest. *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 532–33, 113 S.Ct. 2217, 124 L.Ed.2d 472, 490 (1993). But if prohibiting religion is not the object of a law but merely the incidental effect of a generally applicable and otherwise valid provision, the First Amendment has not been violated. *See Smith,* 494 U.S. at 878, 110 S.Ct. at 1599–1600. Thus, the right of free exercise does not relieve an individual of the obligation to comply with a valid and neutral law of general applicability on the ground that the law prohibits conduct that his religion prescribes. *Id.* at 879, 110 S.Ct. at 1600. Moreover, the First Amendment does not require that laws of general application be justified by a compelling governmen-

---

**3.** The court agrees with the bankruptcy court's analysis and conclusion that Midway has standing to assert the rights of the debtors with regard to the First Amendment and RFRA. *See Secy. of State of Md. v. J.H. Munson Co.,* 467 U.S. 947,

956, 104 S.Ct. 2839, 2846–47, 81 L.Ed.2d 786 (1984) (recognizing circumstances where competing considerations outweigh any prudential considerations against third-party standing).

tal interest whenever they burden a particular religious practice. *Id.* at 883, 110 S.Ct. at 1602–03.

■ The court finds that § 548(a)(2)(A) is a valid and neutral law of general application. Nothing in the statute's text, history, or effect evinces an object of targeting religiously motivated transfers of property. *Cf. Hialeah,* supra. The provision is neutral on its face and applies regardless of whether or not the debtor acted with a religious motivation. It also applies without regard to whether the transferee is a religious institution. Although the section expressly defines "value" in economic terms, and thus excludes from "reasonably equivalent value" the spiritual benefits received by one who tithes, this definition is itself neutral toward religion and operates to exclude all types of unquantifiable benefits, not just religious ones. Thus, the provision would apply with equal force if the debtors transferred property to a non-religious charity without receiving some form of economic value in return. *See In re Hodge,* 200 B.R. at 904. This distinction between economic and other types of "value" clearly furthers a significant, legitimate governmental interest of protecting general creditors against unjust diminution of an insolvent debtor's estate, while at the same time recognizing that prior to bankruptcy the estate remains the debtor's property.[4] In sum, the statute is both neutral and generally applicable. It cannot be characterized as an attempt to ban a religious practice. As the bankruptcy court noted, any effect on the religious practice of tithing in this case "is purely incidental to the general bankruptcy practice of equal distribution to creditors." *Mem.Op.,* 183 B.R. at 250. Under the circumstances, avoidance of the debtors' tithes made within one year of bank-

ruptcy does not violate the debtors' right to free exercise of religion.

■ Nor does avoidance of the debtors' tithes violate Midway's "associational freedom to engage in the collective free exercise of religion" or a prohibition on "government entanglement with religion." Aplt.Br. at 26. This is essentially a dispute between competing claimants, one of which is a church, to property transferred from an insolvent debtor. The resolution of the dispute clearly does not involve the court in "questions of religious doctrine, polity, and practice." *See Jones v. Wolf,* 443 U.S. 595, 603, 99 S.Ct. 3020, 3025, 61 L.Ed.2d 775 (1979). Rather, it depends upon the "neutral principles of law" found in the Bankruptcy Code. *Cf. id.* As such, it does·not violate the First Amendment's restriction against civil courts becoming entangled in religious questions. *See Hernandez v. Comm. of Internal Rev.,* 490 U.S. 680, 696–98, 109 S.Ct. 2136, 2147–48, 104 L.Ed.2d 766 (1989) (Provision of IRS code distinguishing between quid pro quo payments and gifts threatened no excessive entanglement between church and state).

### 3. *Religious Freedom Restoration Act.*

■ Lastly, Midway contends that avoidance of the debtors' tithes is contrary to the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C.A. § 2000bb (West Supp.1994). RFRA was enacted in response to the Supreme Court's ruling in *Smith,* supra. Congress found that *Smith* had "virtu-. ally eliminated the requirement that the government justify burdens on religious exercise imposed by laws neutral toward religion" and that "the compelling interest test as set forth in prior Federal court rulings is a workable

---

4. Midway's argument that § 548(a)(2) is hostile to religion because it does not reach other transfers that result in harm to creditors is not persuasive. This "underinclusion" argument assumes that protecting creditors is the only interest served by the statute. The "constructive fraud" section, however, appears to balance the need to protect unsecured creditors with the debtor's potentially conflicting interest in disposing of property as he sees fit. *See Bankr.Mem.Op.* at 24. The latter interest often permits a debtor to diminish the estate through consumption of goods or services. Section 548(a)(2) draws a line be-

tween proper and improper diminution in what would seem to be the only practical way: by determining whether the quantifiable economic value received by the debtor is reasonably equivalent to that of the property transferred. As stated above, this standard is neutral toward religion and can operate to avoid non-religious transfers where no economic value is received by the debtor. Under the circumstances, any "underinclusion" here is inconsequential rather than substantial. *Cf. Hialeah,* 508 U.S. at 544–46, 113 S.Ct. at 2233, 124 L.Ed.2d at 497–98.

test for striking sensible balances between religious liberty and competing prior governmental interests." § 2000bb(a)(4) & (5). Accordingly, Congress adopted RFRA in part "to restore the compelling interest test as set forth in *Sherbert v. Verner,* 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) and *Wisconsin v. Yoder,* 406 U.S. 205, 92 S.Ct. 1526, 32 L.Ed.2d 15 (1972) and to guarantee its application in all cases where free exercise of religion is substantially burdened; ..." § 2000bb(b).

Section 2000bb–1 of RFRA provides in part:

**(a) In general**

Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability, except as provided in subsection (b) of this section.

**(b) Exception**

Government may substantially burden a person's exercise of religion only if it demonstrates that application of the burden to the person—

(1) is in furtherance of a compelling governmental interest; and

(2) is the least restrictive means of furthering that compelling governmental interest.

The bankruptcy court rejected Midway's asserted defense under RFRA, finding that application of § 548(a)(2) did not substantially burden the debtors' exercise of religion and that, even if it did, the provision furthered a compelling governmental interest and was "sufficiently narrow to survive RFRA challenge." *Mem.Op.* at 252. Midway challenges these findings.

At least two other courts have considered RFRA's impact on a trustee's ability under § 548(a)(2) to recover tithes, and both have concluded that RFRA would preclude the trustee from recovering. In *In re Young,* 82 F.3d 1407 (8th Cir.1996), a majority of the panel found that recovery by the trustee would substantially burden the debtors' free exercise of religion and that the government's interests in allowing debtors a fresh start and protecting creditors were not com-

pelling. A dissenting judge in *Young* quoted extensively from Judge Pearson's opinion in the instant case and concluded that RFRA would not prevent the trustee's recovery. In a second case, *In re Hodge,* 200 B.R. 884 (Bankr.D.Idaho 1996), the bankruptcy court agreed with the majority's analysis in *Young.* The court also concluded that the statute failed to meet the "least restrictive means" requirement of RFRA. (The *Hodge* court ultimately permitted the trustee to recover, however, after finding that RFRA was unconstitutional[5] and that recovery did not violate the debtors' First Amendment rights.)

At the outset, the court recognizes and accepts Midway's allegation that tithing is a central tenet of the debtors' religion. "It is not within the judicial ken to question the centrality of particular beliefs or practices to a faith, ..." *Hernandez,* 490 U.S. at 699, 109 S.Ct. at 2148. But the court has serious doubts as to whether the debtors' practice of tithing is "substantially burdened" by the trustee's recovery of the payments in this case. Concededly, recovery by the trustee burdens the debtors' exercise of religion to some degree. The court must disagree with the bankruptcy court insofar as it suggested that § 548(a) imposed no burden at all because the debtors "have already tithed" to the church. *Mem.Op.* at 251. It seems plain that tithing involves not only the act of sacrificing a portion of one's income; it also encompasses giving the church the economic benefit of the tithe in order to support the church's mission. *See In re Young,* 82 F.3d at 1418. The trustee's recovery from the church thwarts this latter aspect of tithing and, to that extent, constitutes a burden on the debtors' exercise of religion. Still, "[n]ot every burden imposed by government ... is substantial enough to force the government to prove that its action is taken in furtherance of a compelling government interest and in the least restrictive manner." *Thiry v. Carlson,* 887 F.Supp. 1407, 1413 (D.Kan. 1995), *affirmed,* 78 F.3d 1491 (10th Cir.1996).

To exceed the "substantial burden" threshold under RFRA, the government regulation must significantly inhibit or con-

5. Neither party in this case has raised any issue regarding the constitutionality of RFRA.

strain conduct or expression that manifests some central tenet of an individual's beliefs, must meaningfully curtail an individual's ability to express adherence to his or her faith, or must deny an individual reasonable opportunities to engage in those activities that are fundamental to a person's religion. *Werner v. McCotter*, 49 F.3d 1476, 1480 (10th Cir. 1995). Additionally, the incidental effects of otherwise lawful government programs "which may make it more difficult to practice certain religions but which have no tendency to coerce individuals into acting contrary to their religious beliefs" do not constitute substantial burdens on the exercise of religion. *Thiry v. Carlson*, 78 F.3d 1491, 1495 (10th Cir.1996) (quoting *Lyng v. Northwest Indian Cemetary Protective Ass'n.*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988) and applying it in a RFRA case). The burden of proving the existence of a substantial interference with the right of free exercise rests upon the religious adherent. After this threshold showing has been made, the burden shifts to the government to show that the challenged regulation furthers a compelling governmental interest in the least restrictive manner. *Werner*, 49 F.3d at 1480, n. 2.

The court finds that Midway has failed to meet its burden of showing a substantial burden on the debtors' exercise of religion. To begin with, the statute at issue here is so circumscribed in its effect that it can be fairly characterized as interfering only minimally with the debtors' ability to tithe. The provision applies only when the debtors are insolvent, only when they receive no reasonably equivalent value in exchange for their tithe, and only for a period within one year of the filing of the petition. As the bankruptcy court suggested, these relatively narrow provisions left the debtors in this case a reasonable opportunity both before and after bankruptcy to carry on the practice of tithing. Even in the one year period before bankruptcy the debtors were not directly prohibited from giving tithes to the church, although, as mentioned above, the trustee's recovery indirectly burdened the act of tithing by preventing the church from enjoying the benefit of it. Significantly, there was no constraint of conduct or belief in this case by operation of § 548, nor was there a significant curtailment of the debtors' ability to express adherence to their faith. *See In re Young*, 82 F.3d at 1421 (dissent). Nor does the statute operate to coerce the debtors into any conduct that is contrary to their beliefs. *Cf. Sherbert v. Verner*, 374 U.S. 398, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963) (employment benefit law impermissibly coerced plaintiff into working on the Sabbath). In sum, there has been no showing of a substantial burden on the exercise of religion and Midway has not demonstrated a valid RFRA defense to the trustee's complaint.

In comparison to this modest burden on the debtors' practice of religion, the government's significant interests in maintaining an equitable system for protecting creditors, for permitting debtors to obtain a "fresh start" from overwhelming debt, and in avoiding excessive entanglement with religious matters are compelling. *Cf. United States v. Lee*, 455 U.S. 252, 261, 102 S.Ct. 1051, 1057, 71 L.Ed.2d 127 (1982) (Government's interest in maintaining social security system outweighed burden on beliefs of those who objected to paying such taxes; "[w]hen followers of a particular sect enter into commercial activity as a matter of choice, the limits they accept on their own conduct as a matter of conscience and faith are not to be superimposed on the statutory schemes which are binding on others in that activity.") In sum, even if the court were to find a "substantial burden" in this case, it would nevertheless conclude that the burden is justified by a compelling governmental interest. In this regard, the court respectfully disagrees with *In re Young*, 82 F.3d 1407, 1420 (8th Cir.1996), wherein the Eighth Circuit concluded that the interests furthered by § 548 are not comparable to the interests in the tax code or social security system discussed by the Supreme Court in *Hernandez* and *Lee*, supra. Just as *Lee* recognized that "it would be difficult to accommodate the comprehensive social security system with a myriad of exceptions flowing from a wide variety of religious beliefs," the court believes that the effectiveness of the bankruptcy system could be frustrated if creditors' remedies were made subject to various ex-

478

ceptions based on the religious beliefs of debtors. When weighed against the intrusion on the debtors' religious practices in this case, the interests furthered by § 548(a)(2) are sufficiently important to qualify as "compelling" under RFRA. Moreover, the court concludes that the statute satisfies the "least restrictive means" requirement of RFRA. As was noted *supra* in footnote 4, the statute balances the potentially conflicting interests of debtor and creditor in what is the only practical manner available.

## C. *Conclusion.*

Tensions between deeply held individual beliefs and the demands of civil authority are not new. For example, Christian Scripture relates that adversaries of Jesus attempted to trick him by asking in the presence of sympathizers of Herod, the Roman ruler of Judea, whether it was lawful for Jews to pay taxes to their Roman occupiers. When Jesus asked whose image was on the coin used for such tribute, they replied, "Caesar's." He then said in answer to their question, "Render therefore unto Caesar, the things which are Caesar's; and unto God, the things that are God's." Matthew 22:21. The guarantee of freedom of religion embodied in the First Amendment likewise reflects the view that religious believers must sometimes "render unto Caesar": "Conscientious scruples have not, in the course of the long struggle for religious toleration, relieved the individual from obedience to a general law not aimed at the promotion or restriction of religious beliefs." *Smith*, 494 U.S. at 879, 110 S.Ct. at 1600 (quoting *Minersville School Dist. Bd. of Ed. v. Gobitis*, 310 U.S. 586, 594–95, 60 S.Ct. 1010, 1013, 84 L.Ed. 1375 (1940)).

The bankruptcy court properly found that the trustee was entitled to recover under § 548(a)(2)(A) and that such recovery did not violate the rights of the debtors or Midway under the First Amendment or the Religious Freedom Restoration Act. Accordingly, the judgment of the bankruptcy court is AFFIRMED. IT IS SO ORDERED.