In re Daniel Joseph GOMES and Laurie Ann Gomes, Debtors.

Donald H. HARTVIG, Trustee, Plaintiff,

v.

**TRI–CITY BAPTIST TEMPLE OF MILWAUKIE, INC., Defendant.**

Bankruptcy No. 96–38898–RLD7.
Adversary No. 97–3309.

United States Bankruptcy Court, D. Oregon.

April 7, 1998.

Teresa H. Pearson, Green & Markley, P.C., Portland, OR, for Plaintiff.

Herbert G. Grey, Schwabe, Williamson & Wyatt, Portland, OR, Kelly E. Ford, Beaverton, OR, for Defendant.

## MEMORANDUM OPINION

RANDALL L. DUNN, Bankruptcy Judge.

This adversary proceeding was heard on March 24, 1998, on the parties' cross-motions for summary judgment, Teresa H. Pearson of Greene & Markley, P.C., appearing in behalf of the plaintiff, Donald H. Hartvig, Trustee (the "Trustee"), and Herbert G. Grey and Kelly E. Ford appearing in behalf of the defendant, Tri–City Baptist Temple of Milwaukie, Inc. (the "Church"). This is a core proceeding over which this court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334

and United States District Court of Oregon Local Rule 2100–1.

## STIPULATED FACTS

The parties have stipulated to certain facts for purposes of considering their respective motions, including the following:

The debtors, Daniel Joseph Gomes and Laurie Ann Gomes (the "Gomes"), filed a voluntary petition under Chapter 7 of the Bankruptcy Code on November 22, 1996. The parties agree that the Gomes became insolvent for purposes of 11 U.S.C. §§ 548(a)(2) and 544(b)[1] on February 1, 1996, approximately ten months before they filed their Chapter 7 bankruptcy petition, as a result of the failure of their wholesale candy business.

The Church is an independent Baptist Church. It was formed as an Oregon non-profit corporation in 1974 and has operated continuously since that time in Gladstone, Oregon.

The Gomes made transfers (the "Transfers") to the Church prior to their bankruptcy filing, all in the form of tithes and offerings, totaling $6,124.00 after February 1, 1996. The Gomes had ownership and property interests in said $6,124.00 when they made the Transfers to the Church. The Gomes received no economic benefit or tangible personal property in exchange for the Transfers.

The Trustee regularly makes demands to a wide variety of entities, including but not limited to, individuals, businesses, governmental entities, religious institutions and secular charities, for repayment of transfers made by debtors prior to the petition dates in their Chapter 7 bankruptcies pursuant to Sections 547, 548, 549 and 550. The Trustee takes such actions without regard to whether an entity is religious or secular in nature, and for religious entities, without regard to any particular entity's religious doctrine or affiliation. In filing this adversary proceeding, the Trustee asserted the rights of all unsecured creditors with claims against the Gomes, including a number of unsecured creditors whose claims arose prior to February 1, 1996. In doing so, the Trustee was fulfilling his fiduciary duty to the creditors of the Gomes' bankrupt estate by seeking to recover funds for the creditors to share consistent with the scheme for distribution provided for in the Bankruptcy Code.

The Church conducts many different types of ministries and programs typically associated with Christian churches and community organizations. Participation in all of the Church's programs is available both to Church members and to the community at large. The Church provides its programs without inquiry as to whether participants have made financial contributions to the Church. The Church does not charge fees to those who attend its worship services and does not condition provision of services upon payment for them, *except* that it does collect fees in connection with special functions such as retreats and youth trips and derives revenue from sales of goods at fundraising events for its youth programs and from investment income earned on the Church's financial reserves. More than 95% of the Church's total income is received from tithes and offerings. Performance of the Church's ministries and programs is made possible through the contributions of the Church's members, visitors and other financial supporters.

The Church's payroll and payroll taxes, insurance, utilities, equipment, supplies, building and equipment maintenance expenses, bus operation expenses, and all other regular, recurring expenses of the Church are paid from funds received as tithes and offerings. The Church periodically budgets for its future operations based on the level of recent contributions. In establishing its budget, the Church expects that members will continue to support the Church's ministries by consistent giving. In light of the Church's reliance on tithes and offerings as a substantial portion of its annual budget, any reduction in tithes and offerings affects the Church's ability to maintain its programs. The total amount of the Transfers is approxi-

---

**1.** Unless otherwise indicated, all references to Sections are to the Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*

mately one percent of the Church's annual budget.

The Church strongly encourages its members to tithe, through its teachings, its publications and its ministries. However, people are not required to tithe or to make individual contributions in order to become or remain members of the Church. Individual contributions are made confidentially in numbered envelopes, and only the Church secretary is aware of who makes contributions and in what amounts contributions are made. The Church secretary tracks individual contributions to provide statements for contributors' tax reporting purposes. If a member fails to tithe or to make individual contributions, such failure is not a basis for revoking membership or denying access to any of the Church's services or ministries.

The Gomes have been members of the Church since the late 1970's, and they consistently have contributed ten percent of their gross income as tithes to the Church for many years, including the year prior to the filing of their bankruptcy petition, as an article of their faith. Their pattern of giving to the Church did not increase during the year preceding their bankruptcy filing, and none of their giving to the Church was done with the purpose of defrauding any of their creditors. The Gomes continued their regular attendance at and participation in the ministries of the Church during the year prior to their bankruptcy filing, as they have subsequently. However, the Gomes did not contribute their tithes and offerings as a *quid pro quo* for their continuing access to Church services or the Church's ministries. The Gomes were aware that they could continue to be members of the Church and participate in all Church programs even if they did not tithe. The Gomes received statements of their contributions to the Church for use with respect to their tax filings, and the Gomes deducted their contributions to the Church on their 1995 and 1996 federal and Oregon state income tax returns.

### ISSUE

The issue in this case is whether the Trustee can avoid the Transfers pursuant to Sections 548(a)(2) and 544(b), as transfers of property of the Gomes made within one year preceding their bankruptcy filing while they were insolvent, in exchange for less than a reasonably equivalent value.

### DISCUSSION

#### A. Summary Judgment Standards

Granting a motion for summary judgment is appropriate only if there is no genuine dispute as to any material facts, and the moving party is entitled to judgment as a matter of law. Fed.R.Bankr.P. 7056; Fed.R.Civ.P. 56(c); *State Farm Mutual Auto. Ins. Co. v. Davis*, 7 F.3d 180, 182 (9th Cir. 1993). Material facts are such facts as may affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute with regard to a material fact is "genuine" only if there is sufficient evidence to justify a finding in favor of the nonmoving party. *Id.* In considering a motion for summary judgment, the court is required to draw all inferences from the evidence in the light most favorable to the nonmoving party. *Id.*

#### B. Avoidable Transfers Under Sections 548(a)(2) and 544(b)

##### 1. Standards for Avoidance

The Trustee asserts that the Transfers to the Church are avoidable pursuant to Sections 548(a)(2) and 544(b). Section 548(a)(2) provides in relevant part as follows:

Fraudulent transfers and obligations

(a) The trustee may avoid any transfer of an interest of the debtor in property ... that was made ... on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily—

.    .    .    .    .

(2)(A) received less than a reasonably equivalent value in exchange for such transfer ...; and

(B)(i) was insolvent on the date that such transfer was made....

Section 544(b) provides that the "trustee may avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unse-

cured claim. . . ." The provision of Oregon state law applicable in this case through Section 544(b) is ORS 95.240(1), which provides that:

> A transfer made . . . by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made . . . if the debtor made the transfer . . . without receiving a reasonably equivalent value in exchange for the transfer . . . and the debtor was insolvent at that time. . . .

The United States Supreme Court has held that a trustee in bankruptcy may avoid a transfer under Section 548(a)(2) if the following matters are established:

> 1) that the debtor had an interest in property;
>
> 2) that a transfer of that interest occurred within one year of the filing of the bankruptcy petition;
>
> 3) that the debtor was insolvent at the time of the transfer . . .; and
>
> 4) that the debtor received "less than a reasonably equivalent value in exchange for such transfer."

*BFP v. Resolution Trust Corp.*, 511 U.S. 531, 535, 114 S.Ct. 1757, 1760, 128 L.Ed.2d 556, *reh'g denied,* 512 U.S. 1247, 114 S.Ct. 2771, 129 L.Ed.2d 884 (1994). In light of the provisions of ORS 95.240(1), cited above, the standards for determining whether a trustee in bankruptcy may avoid an Oregon transfer under Section 544(b) are for all practical purposes identical.[2]

█ Under both Sections 548(a)(2) and 544(b), the Trustee has the burden of proof by a preponderance of the evidence. *See, e.g., Western Wire Works, Inc. v. Lawler (In re Lawler),* 141 B.R. 425, 428 (9th Cir. BAP 1992); and *Vaughan v. McDowell (In re McDowell),* 173 B.R. 131, 134 (Bankr. N.D.Ohio 1994).

### 2. *Reasonably Equivalent Value*

The Stipulated Facts establish that the Transfers comprised assets in which the Gomes had an ownership interest and were

made within one year prior to the date of filing of the Gomes' Chapter 7 petition, during a period when they admittedly were insolvent. Accordingly, the initial focus of the parties' dispute is whether the Gomes received less than a reasonably equivalent value in exchange for the Transfers.

Section 548(d)(2)(A) provides that "value" means "property, or satisfaction or securing of a present or antecedent debt of the debtor. . . ." Since there is no contention in this case that, in making the Transfers, the Gomes satisfied or secured a present or antecedent debt, the dispute regarding value turns on the meaning of the term "property."

The parties agree that the Gomes did not receive any economic benefit or tangible personal property in exchange for the Transfers. However, the Church contends that the spiritual benefits the Gomes received from their participation in Church services and ministries have value that should not be disregarded in determining trustee avoidance actions. In addition, the Church points out that the Gomes regularly attended worship services and attended Church sponsored activities conducted by or under the supervision of personnel on the Church's payroll, and the Church provided the facilities for all such services and activities, including normal utilities, without charge.

The Church argues that such services constitute "property" for value determination purposes, citing *Ellenberg v. Chapel Hill Harvester Church, Inc. (In re Moses),* 59 B.R. 815 (Bankr.N.D.Ga.1986), and *Wilson v. Upreach Ministries (In re Missionary Baptist Foundation of America, Inc.),* 24 B.R. 973 (Bankr.N.D.Tex.1982). In addition, the parties have stipulated that providing such services would not be possible in the absence of the Church's predictable receipt of tithes and offerings from contributors such as the Gomes. In these circumstances, particularly in light of the fact that the Gomes did not tithe to the Church with any intent to defraud their creditors,[3] the Church argues

---

**2.** ORS 95.280(2) provides a four-year statute of limitations for claims brought under ORS 95.240(1).

**3.** The title of Section 548 is "Fraudulent transfers and obligations." However, as applied to the facts of this case, that title is a misnomer. There is no contention by the Trustee or other-

that it would be inappropriate and inequitable to apply the provisions of Sections 548(a)(2) and 544(b) to avoid the Transfers.

The Trustee responds that value is present for purposes of Sections 548(a)(2) and 544(b) only where there is an economic benefit to the debtor, "because the purpose of the fraudulent conveyance laws is to preserve the economic value of the debtor's estate for the benefit of the unsecured creditors." Trustee's Reply Memorandum at p. 3. *See, e.g., Wyle v. C.H. Rider & Family (In re United Energy Corp.),* 944 F.2d 589, 597 (9th Cir. 1991); *Weinman v. Word of Life Christian Center (In re Bloch),* 207 B.R. 944, 948 (D.Colo.1997); *Morris v. Midway Southern Baptist Church (In re Newman),* 203 B.R. 468, 473–74 (D.Kan.1996).

■ One of the primary goals of the Bankruptcy Code is to achieve equality of distributions to like situated creditors. 1 *Collier on Bankruptcy* ¶1.03[2][a] at 1–21 (15th ed.1998). If Bankruptcy Courts must factor the worth of nonmarketable services or such intangible benefits as religious inspiration into their value determinations, it may be difficult, if not impossible, to avoid inequities. In addition, making value determinations with respect to the services performed by religious institutions would appear to encourage precisely the sort of entanglement with religion that courts generally are admonished to avoid. *See Employment Division, Department of Human Resources of Oregon v. Smith,* 494 U.S. 872, 887, 110 S.Ct. 1595, 1604, 108 L.Ed.2d 876 (1990):

> Judging the centrality of different religious practices is akin to the unacceptable "business of evaluating the relative merits of differing religious claims." *United States v. Lee,* 455 U.S., [252] at 263 n. 2, 102 S.Ct., [1051] at 1058 n. 2, [71 L.Ed.2d 127 (1982)] (STEVENS, J., concurring).... Repeatedly and in many different contexts, we have warned that courts must not presume to determine the place of a particular

belief in a religion or the plausibility of a religious claim. [Citations omitted.]

■ Ultimately, the Bankruptcy Code looks to underlying state law to determine what is "property." *See Nobelman v. American Savings Bank,* 508 U.S. 324, 329, 113 S.Ct. 2106, 2110, 124 L.Ed.2d 228 (1993); *Butner v. United States,* 440 U.S. 48, 55, 99 S.Ct. 914, 918, 59 L.Ed.2d 136 (1979) ("Property interests are created and defined by state law.").

Oregon fraudulent transfer law defines "property" as "anything that may be the subject of ownership." ORS Section 95.200(10). That definition is consistent with the definition of "property" in *Black's Law Dictionary* 1216 (6th ed.1990):

> [t]hat which is peculiar or proper to any person; that which belongs exclusively to one.... The term is said to extend to every species of valuable right and interest. More specifically, ownership; the unrestricted and exclusive right to a thing; the right to dispose of a thing in every legal way, to possess it, to use it, and to exclude every one else from interfering with it....

Likewise, the first definition of property included in the *Oxford English Dictionary* 1471 (1971) is

> [t]he condition of being owned by or belonging to some person or persons ...; the holding of something as one's own; the right (*esp.* the exclusive right) to the possession, use, or disposal of anything (usually of a tangible material thing); ownership, proprietorship....

*See also Fishburn v. Londershausen,* 50 Or. 363, 368–69, 92 P. 1060 (1907).

■ What the foregoing definitions have in common is the characterization of property as ownership or an exclusive right to possession. In this case, the religious services and ministries of the Church from which the Gomes derived benefit were provided freely and on a nonexclusive basis to Church mem-

---

wise that the Transfers of tithes and offerings by the Gomes to the Church were intended to be "fraudulent." For purposes of this court's review of the facts and law in this case, the Gomes' good faith in making the Transfers and the

Church's good faith in accepting them are undisputed. Nonetheless, the Bankruptcy Code incorporates the legal concept of "constructive fraud," which does not take into account the subjective intent of parties to a transfer.

bers and the community. The Gomes had and have no enforceable proprietary interest in such Church services. *See Morris v. Midway Southern Baptist Church (In re Newman)*, 183 B.R. 239, 247 (Bankr.D.Kan.1995), *aff'd*, 203 B.R. 468 (D.Kan.1996). Accordingly, the Gomes did not and do not have any "property" interest in such services for purposes of Section 548(d)(2)(A) and on that basis did not receive a reasonably equivalent value for the Transfers.

### 3. "... In Exchange For...."

■ Even if this court were to determine that the Gomes received value for §§ 548(a)(2) and 544(b) purposes, the evidence establishes that any such value was not received "in exchange for" the Transfers. The parties have stipulated that the Gomes did not contribute their tithes and offerings as a *quid pro quo* for their continued participation in Church services and ministries. The Gomes were aware that they could continue to be members of the Church and participate in all Church programs even if they did not tithe.

■ In addition, the Gomes deducted their 1996 contributions to the Church, including the Transfers, as charitable contributions on their federal and state income tax returns. For purposes of Section 170 of the Internal Revenue Code, 26 U.S.C. § 170, a charitable contribution is a gift or "voluntary transfer of property by the owner to another without consideration therefor." *DeJong v. Commissioner*, 36 T.C. 896, 899, 1961 WL 1315 (1961), *aff'd*, 309 F.2d 373 (9th Cir.1962). In *Hernandez v. Commissioner*, 490 U.S. 680, 690, 109 S.Ct. 2136, 2144, 104 L.Ed.2d 766 (1989), the United States Supreme Court discussed the genesis of the charitable contributions provision of the Internal Revenue Code:

> The legislative history of the "contribution or gift" limitation, though sparse, reveals that Congress intended to differentiate between unrequited payments to qualified recipients and payments made to such recipients in return for goods or services. Only the former were deemed deductible. The

House and Senate Reports on the 1954 tax bill, for example, both define "gifts" as payments "made with no expectation of a financial return commensurate with the amount of the gift." [Citations omitted.]

In light of the evidence presented in this case, it would be inappropriate and inconsistent to find, for purposes of Sections 548(a)(2) and 544(b), that the Gomes made the Transfers in exchange for a reasonably equivalent value in the form of services and benefits from the Church.

### C. Constitutional Issues

#### 1. RFRA v. Smith.

The Church asserts as an affirmative defense that the Trustee's avoidance and recovery of the Transfers would violate the rights of the Gomes and the Church under the Free Exercise Clause of the First Amendment to the United States Constitution.[4] The parties disagree on the applicable standard for review, the constitutionality of Congress' efforts to establish standards for review under the Religious Freedom Restoration Act ("RFRA"),[5] and whether Sections 548(a)(2) and 544(b) impose a substantial burden on the free exercise of religion.

The Church argues that in light of the requirements of RFRA, the Trustee's enforcement of Sections 548(a)(2) and 544(b) against the Church to recover the Transfers is subject to strict scrutiny and may be authorized only if such enforcement is the least restrictive means of furthering a compelling government interest. The Trustee contends that because Sections 548(a)(2) and 544(b) are valid, neutral statutes of general applicability, they are not subject to strict scrutiny, but rather are constitutional in light of their reasonable justification. *See Employment Division, Department of Human Resources v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). The Trustee further asserts that RFRA's standards are inapplicable following the Supreme Court's determination that RFRA is unconstitutional. *See*

---

4. Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof....

5. 42 U.S.C. § 2000bb, *et seq.*

*City of Boerne v. Flores,* —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997).

The Church asserts that the *Boerne* decision only declared RFRA unconstitutional as applied to state government action and that RFRA remains valid and supplies the appropriate standards for analyzing federal law in the First Amendment context. The Trustee counters that the 9th Circuit has interpreted the *Boerne* decision to restore the reasonableness test as the applicable standard for reviewing free exercise challenges to federal as well as state law. *See Freeman v. Arpaio,* 125 F.3d 732, 736 (9th Cir.1997). The Trustee further argues that Section 544(b) of the Bankruptcy Code is merely a procedural vehicle for the enforcement of state law, and, accordingly, the *Boerne* decision's determination of RFRA unconstitutionality for state law purposes would govern any determination under Section 544(b).

■ As a threshold matter, unless enforcement of the concerned statutes imposes a "substantial burden" on the religious practices or beliefs of the Gomes or the Church, I do not need to reach any issues regarding the constitutionality of RFRA or the application of RFRA strict scrutiny versus the *Smith* reasonableness standard. I find no such substantial burden under the facts before me.

In *Bryant v. Gomez,* 46 F.3d 948, 949 (9th Cir.1995), the Ninth Circuit stated the test for determining whether a substantial burden has been imposed on the free exercise of religion:

> In order to show a free exercise violation using the "substantial burden" test, the religious adherent . . . has the obligation to prove that a governmental [action] burdens the adherent's practice of his or her religion . . . *by preventing him or her from engaging in conduct or having a religious experience which the faith mandates. This interference must be more than an inconvenience; the burden must be substantial and an interference with a tenet or belief that is central to religious doctrine.* [Citations omitted.] [Emphasis added.]

In this case, the facts are undisputed that even though members of the Church are strongly encouraged to tithe, tithing is not required to become or remain a member of the Church. Further, the programs and ministries of the Church are available to Church members and the community at large whether or not they tithe or otherwise contribute to the Church. The Gomes were aware that they did not need to tithe or contribute to the Church in order to retain their membership in the Church and participate in all of its ministries. Finally, the Gomes "continued their regular attendance at and participation in the ministries at the Church during the year before they filed their petition, *as they have subsequently.*" Stipulated Facts, p. 9. [Emphasis added.]

There is nothing in Sections 548(a)(2) and 544(b) that prevents a debtor from continuing to tithe. The Trustee's efforts to avoid the Transfers have neither restricted the Gomes in their prepetition or postpetition tithing practices nor done anything to shake the Gomes' belief that they should tithe. The recovery of prepetition tithes "may embarrass the debtor, but it does not burden the debtor's ability to engage in the exercise of religion by making postpetition tithes." Megard, "Tithing and Fraudulent Transfers in Bankruptcy: Confirming a Trustee's Power to Avoid the Tithe After *City of Boerne v. Flores,*" 71 *American Bankr.L.J.* 413, 424 (1997).

In addition, as written and applied, Sections 548(a)(2) and 544(b) are limited in their impact. First, they only allow a bankruptcy trustee to reach back for defined periods of time *prior* to the debtor's bankruptcy filing. The trustee may not avoid all of a debtor's tithes to a church over the years and may not reach postpetition tithes.

Second, they only allow a bankruptcy trustee to avoid transfers made for less than a reasonably equivalent value. Finally, the trustee is subject to the further substantial limitation that the debtor must be proven insolvent before any transfer may be avoided.

The Church argues that notwithstanding the foregoing limitations, the Trustee's exercise of his avoidance powers imposes a sub-

stantial burden on the practice of religion, because the Church relies on the consistent giving of its members to fund its programs.

The Church asserts that *any* disgorgement of tithes to the Trustee jeopardizes its ability to continue its ministries by creating budgeting uncertainty. However, the Church does not provide services in the expectation that *all* of its members will contribute to the funding of such services. One of the primary functions of the Church is relief of the poor. *See* Church's Memorandum at p. 15. There can be little question that insolvent debtors generally would qualify among the poor, and the Church reasonably could not expect to collect tithes from its insolvent debtor members.

It is understandably important to the Church to achieve as consistent a level of financial support for its services as possible. Undoubtedly, the Trustee's efforts to avoid the Transfers came as an unpleasant and unexpected surprise to the Church, which did not budget for a recovery by the Trustee. However, in a very mobile society, tithes and offerings inherently are subject to fluctuations due not just to the financial reverses of Church members, but also to the moves and deaths of members. Being subject on occasion to the recovery by a bankruptcy trustee of a limited portion of an insolvent debtor's tithed funds does not constitute the type of substantial burden on religion that would justify heightened scrutiny under RFRA or the Constitution.

In the circumstances of this case, the burdens imposed on the Gomes and the Church by the Trustee's exercise of avoidance powers under Sections 548(a)(2) and 544(b) are not substantial burdens on the exercise of religion that would invalidate those sections under RFRA, whether or not RFRA remains constitutionally viable.

### 2. The Establishment Clause

The Church further contends that the Trustee's attempts to avoid the Transfers result in an excessive and unconstitutional governmental intrusion and entanglement in religion in violation of the Establishment Clause of the First Amendment to the Constitution.

■ In *Lemon v. Kurtzman,* 403 U.S. 602, 612–13, 91 S.Ct. 2105, 2111, 29 L.Ed.2d 745, *reh'g denied,* 404 U.S. 876, 92 S.Ct. 24, 30 L.Ed.2d 123 (1971), the Supreme Court set forth a three part test to evaluate the constitutionality of statutes under the Establishment Clause:

> First, the statute must have a secular legislative purpose; second, its principal or primary effect must be one that neither advances nor inhibits religion ...; finally, the statute must not foster "an excessive government entanglement with religion."

■ In applying the *Lemon* test, the first step is analyzing the text of the statute(s) under consideration. In this case, there is nothing in either the texts or the legislative histories of Sections 548(a)(2) and 544(b) that refers to religion or any religious organization or even hints that the statutes were targeted at any religiously motivated transfers. The subject statutes are neutral with respect to religion and generally applicable according to their terms.

However, that does not end the investigation. As stated by the court in *Fitzgerald v. Magic Valley Evangelical Free Church, Inc. (In re Hodge),* 200 B.R. 884, 903 (Bankr.D.Idaho 1996): "The court ... must also look at the effect of the law in its real application as strong evidence of its object."

In enforcing his bankruptcy avoidance powers, the Trustee does not discriminate against religion in general or the Church in particular. The Stipulated Facts reflect that the Trustee regularly exercises his avoidance powers to recover from a wide variety of individuals and entities, including religious institutions and secular charities without regard to the religious or secular nature of such entities or to any particular entity's religious creed or affiliation.

For this reason, the Church's reliance on *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah,* 508 U.S. 520, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993), is misplaced. In the *Lukumi* case, the record established that the city ordinances at issue were designed and implemented with the specific purpose of re-

stricting the animal sacrifice practices of the Santeria church.

In contrast, Sections 548(a)(2) and 544(b) provide tools for a trustee in bankruptcy to recover prepetition transfers by debtors to individuals and entities of all kinds, with the goal of equalizing the recoveries by similarly situated creditors from debtors' bankrupt estates. *See In re Hodge,* 200 B.R. at 903–04:

> In this case, the subject statutes make no reference to religions or to religious practice. Similarly, Defendant has offered no proof that the statutes were in any way intended to target religious activity. The provisions merely allow a bankruptcy trustee to recover certain transfers when specified criteria are satisfied. None of those criteria are related to religious belief or practices, nor is it relevant whether there exists a religious motivation for the transfers. Further, the Court finds that the avoidance statutes have no more than an incidental effect on religion. The purpose of the statutes is to promote the equal treatment of similarly situated creditors of the debtor, and to enlarge the pool of funds available for those creditors by recovering gratuitous transfers made by insolvent debtors. [Internal citations omitted.]

█ The Church nonetheless responds that it is unfair for the reach of Sections 548(a)(2) and 544(b) to extend to the normal tithes and offerings of a Church member made in the ordinary course where the member made no change in the pattern of giving during the period preceding a bankruptcy filing. However, if Congress wanted to incorporate an exception for ordinary course giving in Sections 548(a)(2) and 544(b), it knew how to do so. For example, Section 547, dealing with bankruptcy trustees' avoidance of preferential transfers, specifically incorporates a defense for transactions in the ordinary course of business. *See* 11 U.S.C. § 547(c)(2). This court is in no position to recognize an exception to avoidance powers where Congress did not create one.

█ Because Sections 548(a)(2) and 544(b) each has a clear secular purpose, the primary effect of which neither advances nor inhibits religion, the statutes do not violate the Establishment Clause of the First Amendment.

### 3. *Excessive Entanglement*

The Church characterizes the Trustee's exercise of authority under Sections 548(a)(2) and 544(b) as "government action that audits church ledgers and retroactively seizes private contributions made to a church." Church Memorandum at p. 26. The Church asserts that this government action constitutes an unconstitutional entanglement in religious affairs.

I disagree. The Supreme Court has held that the recordkeeping requirements of the Fair Labor Standards Act are not substantially burdensome on religious organizations. *Tony and Susan Alamo Foundation v. Secretary of Labor,* 471 U.S. 290, 105 S.Ct. 1953, 85 L.Ed.2d 278 (1985). In comparison, the nontargeted requirement that a church submit on occasion to trustee discovery in relation to potential avoidance claims would appear to constitute even less of an entanglement. *See also Jimmy Swaggart Ministries v. Board of Equalization of California,* 493 U.S. 378, 395–96, 110 S.Ct. 688, 698–99, 107 L.Ed.2d 796 (1990) ("[G]enerally applicable administrative and recordkeeping regulations may be imposed on religious organization without running afoul of the Establishment Clause."); *In re Hodge,* 200 B.R. at 907 ("[R]outine regulatory interaction between government and churches involving no detailed monitoring or close administrative contact between secular and religious bodies does not violate the anti-entanglement command of the Establishment Clause.").

█ The recovery of contributed tithes and offerings likewise does not rise to an excessive entanglement, because it merely requires the payment of funds; it does not impinge directly on Church beliefs or ministries. Such recovery, on an incidental and occasional basis, has only the indirect and unintended effect of limiting the Church's budget. A much greater entanglement of the government with religion likely would result if this court were to ignore the neutral language of Sections 548(a)(2) and 544(b) and

enforce an exception to the Trustee's avoidance powers for religious entities such as the Church.[6]

#### 4. *No Fifth Amendment [7] Taking*

██ The Bankruptcy Code is subject to the Fifth Amendment prohibition against taking private property without just compensation. *See, e.g., United States v. Security Industrial Bank,* 459 U.S. 70, 75, 103 S.Ct. 407, 410, 74 L.Ed.2d 235 (1982). In *Penn Central Transportation Co. v. City of New York,* 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978), the Supreme Court identified three factors of particular significance in considering unconstitutional takings claims:

a) the economic impact of the law on the claimant;

b) the extent to which the law has interfered with the claimant's reasonable "investment-backed expectations;" and

c) the character of the government action, i.e., did the law promote the common good or some more limited objective.

The Church contends that the Trustee's proposed avoidance of the Transfers constitutes an unconstitutional confiscation of Church property. There is no question that the Trustee's avoidance of the Transfers will have an adverse economic effect on the Church. If the Church is forced to disgorge funds it otherwise would have available to spend on its ministries, it will suffer a financial loss. However, such a loss is within the reasonable investment-backed expectations of the Church for purposes of constitutional analysis.

The provisions of Sections 548(a)(2) and 544(b) have been in existence in virtually their present forms since the Bankruptcy Code was enacted by Congress in 1978. In fact, as the Trustee points out, fraudulent transfer laws have been in existence in vari-ous forms since the Statute of Elizabeth was adopted in 1570. Entities such as the Church that avail themselves of the benefits of United States law are charged with knowledge of its restrictions.

██ The Church reasonably could expect that its receipts from tithes and offerings might be subject to recoupment by a bankruptcy trustee in the event that a Church member who had made such contributions was proved to have been insolvent at the time when such contributions were made. *See, e.g., Hill v. Spencer Savings & Loan Ass'n (In re Bevill, Bresler & Schulman, Inc.),* 83 B.R. 880, 896–98 (D.N.J.1988) (applies constitutional "takings" analysis in the context of trustee avoidance actions under the Bankruptcy Code to uphold the trustee's authority); *Kesselring v. F/T Arctic Hero,* 30 F.3d 1123 (9th Cir.1994) (holding that enforcement of maritime lien that lessor of marine equipment was presumed to know about did not conflict with reasonable investment-backed expectations and did not constitute an unconstitutional uncompensated taking).

Because the avoidance provisions of the Bankruptcy Code were designed to promote the equal distribution scheme of the Bankruptcy Code, their purpose is a public good, i.e., the maximization of estate assets for the highest possible distribution to similarly situated creditors. Accordingly, the Trustee's recovery of the Transfers does not constitute a taking contrary to the provisions of the Fifth Amendment.

#### CONCLUSION

Based upon the Stipulated Facts in evidence in this case and the law as discussed above, the Trustee has established by a preponderance of the evidence his right to recover the Transfers pursuant to the terms of Sections 548(a)(2) and 544(b) and is entitled to summary judgment. The Church has

---

**6.** The Church's reliance on *National Labor Relations Bd. v. Catholic Bishop of Chicago,* 440 U.S. 490, 99 S.Ct. 1313, 59 L.Ed.2d 533 (1979), in this case is not supported. There is no reason to believe, either from the text of the statutes or from the legislative history, that Congress intended to create an exception for religious giving in Sections 548(a)(2) and 544(b). In addition, noth-ing in the facts before this Court suggests that the Trustee's avoidance of the Transfers presents a significant risk that the First Amendment will be infringed.

**7.** " . . . nor shall private property be taken for public use, without just compensation."

failed to establish any statutory or constitutional basis to preclude the Trustee from recovering the Transfers.

This Memorandum Opinion contains the court's findings of fact and conclusions of law, which will not be stated separately.

1. The Trustee's motion for summary judgment is granted.

2. The Church's motion for summary judgment is denied.

3. Counsel for the Trustee shall prepare and submit within ten days following the date of entry of this Memorandum Opinion a form of judgment consistent herewith.